The STATE of Ohio, Appellee,

v.

CUTTIFORD, Appellant.

[Cite as *State v. Cuttiford* (1994), 93 Ohio App.3d 546.]

Court of Appeals of Ohio,
Lorain County.

No. 93CA005506.

Decided March 2, 1994.

*Gregory A. White,* Lorain County Prosecuting Attorney, and *Jonathan E. Rosenbaum,* Assistant Prosecuting Attorney, for appellee.

*Hollace B. Weizel,* for appellant.

DICKINSON, Judge.

Defendant Eric Cuttiford has appealed from his conviction of murder.[1] He has argued (1) that the trial court incorrectly refused to permit testimony about specific instances of violent behavior by decedent from witnesses other than defendant in order to demonstrate decedent's violent character; (2) that the trial court incorrectly instructed the jury about the affirmative defense of self-defense and about the crime of voluntary manslaughter; (3) that the trial court denied

---

1. Defendant was also convicted of obstructing justice and complicity to tampering with evidence. He has not, however, assigned any errors related to those two convictions.

him due process of law by allowing the state to improperly refer to his exercise of his constitutional right to counsel; (4) that his conviction was against the manifest weight of the evidence; and (5) that he was denied effective assistance of trial counsel. We reverse defendant's conviction because the trial court erred in instructing the jury about the affirmative defense of self-defense.

## I

Defendant shot and killed his son-in-law, Raymond Banks, on January 23, 1992. Defendant's wife, Jean Cuttiford, witnessed the shooting.

Banks married the Cuttifords' daughter on August 7, 1982. For the first year or two of their marriage, the Bankses lived with the Cuttifords. The Bankses and the Cuttifords then lived separately for a number of years. At the time of the shooting, the two families were living in the same duplex. It is not clear from the record how long they had shared the duplex.

Defendant and Mrs. Cuttiford lived in the first floor apartment of the duplex; Banks, his wife, and their two small children lived in the second floor apartment. Doors from the kitchens of the apartments opened onto landings of a common internal stairway at the rear of the duplex. That stairway consisted of a number of flights of stairs running between landings. From the landing at the rear of the Cuttifords' apartment, a flight of stairs led up toward the Bankses' apartment and another flight of stairs led down to a landing from which a door opened to the outside rear of the duplex. From the landing at the outside door, a flight of stairs led down to the basement of the duplex. The confrontation that led to Banks's death began on that internal stairway.

At the time of his death, Banks was thirty-two years old, weighed two hundred twenty pounds, and was five feet, ten and one-half inches tall. Defendant was sixty-five or sixty-six years old, weighed one hundred sixty pounds, and was five feet, six and one-half inches tall. Defendant testified that Banks lifted weights daily. He also testified that Banks had physically attacked him on three occasions prior to the night of the shooting. On the first occasion, during 1984, Banks put his hands around defendant's throat without provocation and began to strangle him. Banks backed off when defendant stepped on his toes and threatened him with a chair. On the second occasion, during 1984 or 1985, Banks grabbed him around the neck while defendant was driving his automobile. That confrontation occurred following a disagreement regarding Banks's speaking with a woman in a bar. On the final occasion, during 1991, Banks punched defendant in his shoulder and knocked him into a kitchen cabinet. That confrontation took place because of Banks's perception that defendant did not wish to attend Banks's birthday celebration. According to defendant, Banks had been drinking prior to each confrontation. Defendant also testified that Banks verbally accost-

ed him on numerous occasions when Banks had been drinking and that Banks occasionally taunted him by saying, "Go get your guns." Defendant said that he purchased a container of Mace during October 1991 and carried it with him thereafter to use in defending himself against Banks.

Banks was drinking on January 23, 1992. A deputy coroner testified that his blood-alcohol level was .325 at the time he was taken to the hospital after the shooting. Mrs. Cuttiford testified that, sometime after 4:10 p.m. that day, Banks angrily told her that defendant had complained to him regarding cats that his children kept as pets. A litter box for the cats was kept in the area of the basement at the bottom of the common stairway. Defendant helped care for the cats, including emptying the litter box into the garbage several times a week. According to Mrs. Cuttiford, Banks stated that defendant had told him to keep the cats out of the stairway. Mrs. Cuttiford related that conversation to defendant and he told her that he had not complained to Banks about the cats.

During his testimony, defendant described the confrontation that, according to him, took place later on the evening of January 23, 1992, and that led to his shooting of Banks. At about 7:00 p.m., defendant went to the bottom of the stairway to empty the cats' litter box. Banks called down to him that he did not have to worry about the cats anymore because they were "up here" and he was going to take care of them. Defendant responded that the cats were "no problem." Banks then became angry with defendant:

"He yelled, 'What,' in a loud voice, and he came down the stairs and confronted me at the bottom of the basement stairs.

"He said, 'You're calling me a liar? You're playing with my mind.' And he was shouting as loud as he could. He was livid with rage over a supposed confrontation where I was supposed to have given him an ultimatum to keep his cats upstairs. That never occurred. I became worried because here was a person in a rage over a confrontation that never took place."

As Banks was shouting at defendant, Mrs. Cuttiford entered the stairway from the door that led to the outside rear of the duplex. Banks looked up toward Mrs. Cuttiford and said: "This is between him and me. I'm going to settle this right now, once and for all." Banks then turned back toward defendant and said: "I'm going to get you tonight."

Defendant testified that while Banks was distracted by Mrs. Cuttiford, he took the Mace from his pocket, pointed it at Banks, and tried to discharge it but could not do so. Banks stepped back and said: "If you use that on me, you're dead meat." Mrs. Cuttiford then said something to Banks and he again directed his attention toward her and shouted for her to leave them alone so he could settle with defendant. At that point, defendant ran up the stairs past Banks and Mrs.

Cuttiford. Banks began to follow him, and Mrs. Cuttiford attempted to restrain him although, according to defendant, she "couldn't hold him back forever."

Defendant testified that he did not go through the door to the outside rear of the duplex because it was locked and a key was required to unlock it. Instead, he ran to the kitchen entrance of his apartment and entered it, closing the door behind him. He ran to his bedroom and retrieved two guns that he kept there, a .22 caliber revolver and a .25 caliber semiautomatic pistol. He returned to the kitchen door with the revolver held in his left hand at his side and the semiautomatic held in his right hand. By that time, Banks and Mrs. Cuttiford were on the landing outside the kitchen door. Defendant opened the door and pointed the semiautomatic in Banks's general direction. Although he did not state on direct examination why he opened the kitchen door, on cross-examination he stated that he knew Banks was on his way to the Cuttifords' apartment and he could not bolt the door because Mrs. Cuttiford was still on the stairway. He said he opened the door to be able to protect Mrs. Cuttiford from Banks.

Defendant testified that, after he opened the door, he was standing about a foot inside his apartment and Banks was on the landing, about three feet away from him. He told Banks to go upstairs and he would talk to him in the morning. Banks pointed to the semiautomatic and said:

" 'You don't have the guts to use that, because you're going to have to use it because I'm going to kill you, you son of a bitch.' "

According to defendant, Banks then crouched and lunged at him. Defendant fired two quick shots with the pistol, one of which struck Banks in the left temple. Banks fell to the floor, partially in the apartment and partially on the landing outside the apartment.

Defendant immediately called 911 and reported the shooting. Banks was transported to a hospital by emergency medical personnel who responded to defendant's telephone call. He died the next day without regaining consciousness.

Defendant made a statement to the police on the evening of the shooting. In that statement, he claimed that he had shot Banks as Banks was attempting to attack him with a knife. The police who responded to defendant's 911 call had found a kitchen knife in Banks's left hand. Defendant's initial statement to the police differed from the testimony he ultimately gave at trial in a number of ways.

To begin with, according to defendant's initial statement, as Banks started down the common stairway from his apartment after shouting at defendant about the cats, defendant started up the stairway and the two men met on the landing outside the Cuttifords' apartment. Defendant claimed that Banks was shouting

at him and accusing him of having complained about the cats. He said that Mrs. Cuttiford was also present on the stairway landing. Eventually, according to defendant, he went inside his apartment, retrieved his guns, and returned to the landing. Rather than claiming that he had his guns out and visible when he returned from having retrieved them, he claimed that when he returned to the landing he had the guns in his pockets. He said he "brought the Mace out" and Banks became "extremely agitated and extremely heated." He attempted to fire the Mace but it did not function:

"[T]hen [Banks] really got upset and this time he pushed the kitchen door open. I was standing in front of it * * * he pushed me in and he saw the knife on the dishwasher, so I had no choice then but to pull the gun and he said, 'If you're going to use that you'd better use it now.' "

Defendant claimed that Banks came into his apartment, picked the knife up from the dishwasher and said: "You better use that now or you'll never get to use it. * * * I'm going to get you." According to defendant, at that point he had no choice but to shoot Banks.

Defendant was also asked as part of his first statement whether Banks had ever attacked him in the past. He said that, although he had been verbally abusive, he had never physically attacked him:

"No, he punches holes in the wall and things of this nature, but he hasn't actually physically attacked either myself or my wife in the past. But uh, he does get quite violent and dramatic * * *."

Although the officers questioned him repeatedly about the knife, including telling him that the "evidence technicians" were having "a problem" with the position of the knife and specifically asking him whether he or anyone else had placed the knife in Banks's hand, defendant maintained that Banks had picked it up from the dishwasher and was coming at him with it at the time of the shooting.

Defendant made a second statement to the police on January 27, 1992, four days after the shooting. In that statement, he admitted that he had lied about the knife. He stated that Mrs. Cuttiford had placed the knife in Banks's hand at his direction while he was on the telephone line with the 911 operator. His description of the confrontation in his second statement also changed in a number of other ways to closer to the version he testified to at trial.

In his second statement, defendant said that the confrontation began at the bottom of the common stairway in the basement. He also said that he pulled the Mace from his pocket while they were in the basement and that he did not have the guns on him at that time. He ran past Banks and his wife, entered his apartment, retrieved his guns, and returned to find Banks and Mrs. Cuttiford on

the landing outside the apartment. He no longer claimed that he had the guns in his pocket, but rather said that he had them in his hands when he returned from the bedroom. According to defendant, when Banks saw the guns, he said he was going to kill defendant. Defendant then described what happened next:

"He's standing at the threshold of the door. At that point he said, 'I told you I'm going to kill you.' And he lunged forward and made a fast move. I immediately fired off two rapid shots. One was involuntary because I was nervous and upset and I had no time to, to just figure that one shot. * * * I don't know what shot him the first or the second. I have no idea."

Defendant also described, as part of this statement, the times Banks had allegedly attacked him during 1984 and 1984 or 1985.

Immediately following defendant's statement on January 27, 1992, Mrs. Cuttiford also made a statement. Following Mrs. Cuttiford's statement, the police officer asked defendant why he did not call the police when he was upstairs getting his gun:

"Because he was right behind me * * * coming up the stairs, I knew he, my wife couldn't delay him, I couldn't leave her out there * * * she was in danger.
" * * *

"Then 911 wouldn't have done me any good * * * I couldn't even go to the front door * * * that would do no good * * * I was still leaving my wife in danger and there was no point * * * I could run across the street to the fire station, traffic permitting * * * but you can't gain access there * * * there's a doorbell that you have to ring and wait for somebody to open the door."

Both of defendant's pretrial statements to the police were received into evidence at his trial. He was cross-examined extensively about the inconsistencies among his first statement, his second statement, and his trial testimony. The jury convicted him of murder and he appealed to this court.

## II

### A

Defendant's first assignment of error is that the trial court incorrectly refused to permit testimony about specific instances of Banks's violent behavior from witnesses other than defendant. Defendant has argued that such testimony was admissible to show that Banks was more likely the aggressor in the confrontation that led to his death.

■ When a person accused of attacking someone claims that he acted in self-defense, evidence regarding the alleged victim of the attack is admissible for two

purposes: (1) to demonstrate the defendant's state of mind at the time of the confrontation and (2) to show that the alleged victim was more likely the aggressor. *State v. Baker* (1993), 88 Ohio App.3d 204, 207–209, 623 N.E.2d 672, 674–675. For the first purpose, the critical issue is what the defendant knew about the alleged victim at the time of the confrontation. For that purpose, a defendant is permitted to testify about specific incidents of the alleged victim's violent behavior of which the defendant was aware at the time of the confrontation. The defendant is also permitted to testify regarding what he knew about the victim's reputation for violence at the time of the confrontation.[2] *Id.* at 3. As noted previously, defendant was permitted to testify in this case regarding specific claimed incidents of Banks's violent behavior.

■ For the second purpose, showing that the alleged victim was more likely the aggressor, the critical issue is the alleged victim's character. Generally, evidence regarding a person's character is not admissible for the purpose of showing that the person acted in conformity with his character at a particular time. Pursuant to Evid.R. 404(A)(2), however, evidence of a "pertinent trait of character of the victim of [an alleged] crime offered by an accused" is admissible as evidence that the alleged victim likely acted in conformity with that trait of character. In this case, defendant sought to offer testimony of witnesses other than himself regarding Banks's violent nature to show that Banks acted in conformity with that nature and was the aggressor in the confrontation between them.

Evid.R. 405 sets forth the types of evidence that may be used to show a person's character in those instances in which evidence of character is admissible:

"(A) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. * * *

"(B) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."

In conformity with Evid.R. 405(A), the trial court permitted two witnesses called by defendant to testify that Banks had a reputation for violent behavior. On a number of occasions during the trial, however, the trial court refused to permit witnesses other than defendant to testify regarding specific incidents of Banks's violent behavior.

---

**2.** Corroborating evidence regarding the defendant's state of mind is also admissible. *State v. Baker* (1993), 88 Ohio App.3d 204, 208, 623 N.E.2d 672, 675.

Pursuant to Evid.R. 405(B), specific instances of conduct are only admissible for the purpose of showing character of a person when character or a trait of character is "an essential element of a charge, claim, or defense." An alleged victim's claimed violent nature is not an essential element of self-defense. *State v. Baker* (1993), 88 Ohio App.3d 204, 209–210, 623 N.E.2d 672, 675–676. Accordingly, the trial court correctly refused to receive evidence of specific instances of Banks's violent behavior from witnesses other than defendant. Defendant's first assignment of error is overruled.

## B

Defendant's second assignment of error is that the trial court incorrectly instructed the jury about the affirmative defense of self-defense and about the crime of voluntary manslaughter. Specifically, defendant has argued that the trial court wrongly refused to instruct the jury that a person attacked in his own home does not have a duty to retreat from the attacker and that the trial court improperly instructed the jury that, in order for defendant to be convicted of the lesser included offense of voluntary manslaughter, the state was required to prove beyond a reasonable doubt that defendant had acted with "sudden passion" or in a "fit of rage" when he shot Banks.

## 1

The trial court in this case correctly instructed the jury that, in order to establish that he shot Banks in self-defense, defendant was required to prove three elements by a preponderance of the evidence:

"To establish self-defense, the following elements must be shown: 1, the defendant was not at fault in creating the situation giving rise to the occurrence on January 23, 1992; 2, the defendant had an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was in the use of such force; and, 3, the defendant must not have violated any duty to retreat or avoid the danger." See *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755.

The trial court further correctly instructed the jury regarding defendant's right to use force in defense of a member of his family:

"If a person in good faith and upon reasonable grounds believes that a family member is in imminent danger of death or serious bodily harm, such person may use reasonably necessary force to defend the family member to the same extent as the person would be entitled to use force in self-defense." See *State v. Williford* (1990), 49 Ohio St.3d 247, 249–250, 551 N.E.2d 1279, 1280–1282.

Defendant has argued, however, that the trial court's instructions regarding self-defense were incomplete because it refused to instruct the jury that when a person is within his own home he has no duty to retreat.[3]

In *State v. Williford* (1990), 49 Ohio St.3d 247, 250, 551 N.E.2d 1279, 1281–1282, the Ohio Supreme Court reaffirmed the rule in Ohio that a person attacked in his own home has no duty to retreat:

"In most circumstances, a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation. * * * However, '[w]here one is assaulted in his home, or the home itself is attacked, he may use such means as are *necessary* to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life.' * * * Implicit in this statement of law is that there is no duty to retreat from one's home." (Emphasis *sic* and other citations omitted.) Quoting *State v. Peacock* (1883), 40 Ohio St. 333, 334.

Although not disputing that a person attacked in his own home does not have a duty to retreat, the state has argued that the trial court correctly refused to instruct the jury to that effect in this case:

"The reason was that Raymond Banks was also in his own home. Both the victim and the [defendant] shared two levels of this duplex. The altercation

---

**3.** It does not appear that defendant specifically objected to the instructions given by the trial court regarding self-defense after those instructions were given. He did, however, specifically object at page 288 of the transcript of proceedings to the trial court's announced intention to give the instructions on self-defense "as written." Further, at pages 324 and 325 of the transcript, immediately prior to the trial court's delivering its instructions to the jury, defendant's counsel and the trial court engaged in a colloquy regarding defendant's position that he had "no duty to retreat." That colloquy included defendant's counsel citing *State v. Williford* (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279, in which the Ohio Supreme Court held that "there is no duty to retreat from one's home." *Id.* at 250, 551 N.E.2d at 1282. In *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, the Ohio Supreme Court unanimously held:

"A party does not waive his objections to the court's charge by failing to formally object thereto (1) where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury." *Id.* at paragraph one of the syllabus.

The state has not suggested that defendant failed to sufficiently apprise the trial court of the law that "there is no duty to retreat from one's own home" and, therefore, waived this claimed error. In fact, the state appears to have urged the trial court, despite defendant's having apprised it of the law regarding the absence of a duty to retreat from one's home, not to include such a statement as part of its instructions:

"The State freely concedes that the trial court did not instruct that a person has no duty to retreat if attacked in his own home. This was done at the urgence of the State." Appellee's Brief at 5.

This court concludes, therefore, that the trial court's claimed error of failing to inform the jury that there is no duty to retreat from one's home is properly before us.

occurred in a common area of their own home. The [defendant] admitted that the victim never made it into his apartment." Appellee's Brief at 5.

Much of the confrontation between defendant and Banks took place on the common stairway at the rear of the duplex. In *State v. Garrette* (Feb. 2, 1983), Clinton App. No. CA–484, unreported, 1983 WL 4275, the Court of Appeals for the Twelfth District stated that, while there is a split of authority regarding whether a person attacked in his or her own home has a duty to retreat when the attacker also lives in the same dwelling, "[w]e find the better view to be that where both parties have an equal right to be in the dwelling, a person must retreat if possible before killing an assailant." *Id.* at 6. It is true that Banks's right to be present on the common stairway was equal to defendant's. Assuming that the court in *Garrette* correctly stated the law, therefore, defendant had a duty to retreat from Banks before using deadly force against him while the confrontation was confined to the common stairway. In fact, according to defendant's testimony, he did just that. He ran up the stairway into his own apartment and closed the door behind him. That, however, was not the end of the confrontation.

Once he was in his own apartment, defendant retrieved his guns from his bedroom and returned to the kitchen of the apartment. He testified that he did so for two reasons: to protect his wife and because he believed that Banks would follow him into the apartment.

The state has argued, in effect, that defendant's testimony that he returned to the confrontation to protect Mrs. Cuttiford was not credible. In its brief to this court, it has noted that defendant failed to mention his claimed fear for his wife's safety until after he had first spoken to his lawyer. Based upon its position that defendant's claim that he returned to the confrontation with Banks to protect Mrs. Cuttiford was not credible, the state has argued that defendant reopened his kitchen door for no legal purpose:

"In any event, what [defendant] apparently fails to perceive in this case is that regardless of whether the [defendant] has the duty to retreat the [defendant] in this case did retreat. The State did not merely 'suggest' that the defendant retreated and was out of danger and then returned to the confrontation. The State positively proved that this is the case and the defendant so admitted. * * * In fact, it is clear that the defendant admitted that he had made it into his apartment and that the defendant had not yet entered. * * * On page 216 of the transcript under cross-examination the defendant admitted that he got into his kitchen, closed the door, went from the kitchen through the dining room to his bedroom, opened the drawer, got the guns, went back through the dining room, back to the kitchen, opened the door and then confronted the victim of this case." Appellee's Brief at 5–6.

There are a number of similarities between the facts of this case and the facts that were before the Ohio Supreme Court in *State v. Williford* (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279. In *Williford,* a confrontation between the defendant and the decedent had taken place on the front porch of the defendant's home. The defendant testified that the decedent threatened the defendant's wife. According to the defendant, he went into his house, ran upstairs, and retrieved a .38 caliber revolver from his bedroom. He returned to the first floor of the house to find that the decedent had entered the house. The defendant claimed that he forced the decedent back onto the front porch, fired a warning shot, and then shot the decedent as the decedent attacked defendant's wife, who had also come onto the porch.

The Ohio Supreme Court found that the trial court erred by refusing to instruct the jury that a person does not have a duty to retreat when he is in his own home:

"In the instant case, there was testimony that the confrontation took place inside [the defendant's] house and on [the defendant's] porch. Because the jury was not instructed on the *Peacock* rule, it might have believed that [the defendant] was under a duty to retreat from his home. It was therefore error for the court to fail to give this instruction." *Williford,* 49 Ohio St.3d at 250, 551 N.E.2d at 1282.

The trial court in this case similarly erred in failing to instruct the jury that defendant, once he was inside his own apartment, was privileged to use such means as were necessary to prevent Banks from entering the apartment and was not required to retreat to avoid further confrontation with him.

In this case, regardless of whether defendant had a duty to retreat from the stairway on which the confrontation began, once he reached his own apartment he had no duty to retreat any farther. Just as the defendant in *Williford* ran upstairs and retrieved a gun to use in repelling the intruder in that case, defendant in this case ran to his bedroom and retrieved the guns he kept there. Implicit in the privilege to use necessary force to repel an intruder from one's own home is the opportunity to move about within the sanctuary of that home to retrieve an available weapon. Also implicit in that privilege is that a person is not under a duty to wait for an anticipated intruder in the part of the home most distant from the location at which he expects the intruder to enter. Based upon defendant's testimony in this case, the jury could have found that defendant believed Banks was going to follow him into his apartment and attack him, that although Mrs. Cuttiford was able to delay Banks on the common stairway she would only be able to do so for a short period of time, and that he opened the kitchen door so Banks would see the guns and retreat to his own apartment. Because of the trial court's failure to instruct the jury that defendant did not have

a duty to retreat once he was in his own apartment, however, the jury may have incorrectly believed that defendant violated a duty to retreat when he returned to the kitchen of his apartment rather than staying in another part of the apartment or leaving it entirely. The possibility that the jury was misled was particularly acute based upon the fact that defendant was cross-examined intensely about why, once he was safe in his bedroom with two guns, he returned to the confrontation. Further, the jury may also have incorrectly believed that defendant violated a duty to retreat when, rather than attempting to run to another part of his apartment, he stood in the kitchen and shot Banks as, according to defendant, Banks lunged at him from outside the kitchen door. As noted by the Supreme Court in *Peacock* and reaffirmed in *Williford,* the privilege of an individual within his own home includes a right to prevent an intruder's forcible entry.

Defendant presented evidence which, if believed, would have established the first two elements of his defense of self-defense by a preponderance of the evidence. Defendant testified that the confrontation began when Banks ran down the stairs and started shouting at him about an imagined ultimatum regarding his children's cats. Test results from the hospital indicated that Banks had been drinking heavily that evening. Mrs. Cuttiford's testimony corroborated defendant's testimony that Banks started the confrontation. The assertion that Banks was the aggressor was also corroborated by the two witnesses who testified regarding Banks's reputation for violent behavior.

Defendant also presented evidence which, if believed, would have demonstrated that he had a bona fide belief that he was in imminent danger of death or great bodily harm. According to defendant, during the confrontation in the basement:

"[Banks] looked at [Mrs. Cuttiford] and told her get out of here, get upstairs. He said, 'This is between him and me. I'm going to settle this right now, once and for all.' * * * Then he turned to me again and said, 'I'm going to get you tonight.' "

Banks was larger than defendant and, according to defendant, lifted weights every day. Defendant also testified that Banks had physically attacked him on three prior occasions.

It is true that the jury may have convicted defendant of murder because it found the evidence presented on the first two elements of his defense of self-defense incredible. Based upon the record in this case, however, this court is not convinced beyond a reasonable doubt that, had the jury been fully apprised of the law of self-defense, the verdict would have been the same. Accordingly, that part of defendant's second assignment of error regarding the trial court's jury instructions on self defense is sustained.

2

■ The trial court instructed the jury as follows regarding the crime of voluntary manslaughter.

"If all of you are unable to agree on a verdict of either guilty or not guilty of murder, then you will continue your deliberation to decide whether the State has proved beyond a reasonable doubt all the essential elements of the lesser included offense of voluntary manslaughter.

" * * *

"The essential elements of voluntary manslaughter are: 1, knowingly; 2, cause another's death; 3, while under the influence of sudden passion or in [a] fit of rage; 4, brought on by serious provocation occasioned by the victim; 5, reasonably sufficient to incite the offender; 6, to use deadly force; 7, in Lorain County.

"If you find that the State has proven beyond a reasonable doubt all of the essential elements of the crime of voluntary manslaughter, your verdict must be that the defendant is guilty of voluntary manslaughter."

The trial court's instruction misstated the law applicable in this case regarding the party who had the burden of proving that defendant acted under the influence of sudden passion or in a sudden fit of rage in order to find defendant guilty of voluntary manslaughter.

When a defendant is being tried for murder, it would be illogical to expect the state to attempt to prove that defendant acted "under the influence of sudden passion" or "in a sudden fit of rage"; instead, the state can be expected to try to disprove any such mitigating circumstances in order to prove the crime of murder. See *State v. Muscatello* (1978), 55 Ohio St.2d 201, 203–204, 9 O.O.3d 148, 149–150, 378 N.E.2d 738, 739–740, modified by *State v. Rhodes* (1992), 63 Ohio St.3d 613, 590 N.E.2d 261. The Ohio Supreme Court recently held:

"A defendant on trial for murder * * * bears the burden of persuading the fact finder, by a preponderance of the evidence, that he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, R.C. 2903.03(A), in order for the defendant to be convicted of voluntary manslaughter rather than murder * * *." *State v. Rhodes* (1992), 63 Ohio St.3d 613, 590 N.E.2d 261, syllabus.

■ While the trial court incorrectly instructed the jury about voluntary manslaughter, defendant did not raise any type of objection to that instruction at trial. In the absence of plain error within the meaning of Crim.R. 52(B) this court need not consider any error which the party complaining could have called, but did not call, to the trial court's attention, at a time when such error could

have been avoided or corrected by the trial court. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, at paragraph one of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. The Ohio Supreme Court has noted that "an erroneous jury instruction 'does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.'" (Citation omitted.) *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 227, 4 OBR 580, 581, 448 N.E.2d 452, 453. The Supreme Court further noted that "the plain error rule is to be applied with utmost caution and invoked under exceptional circumstances, in order to prevent a manifest miscarriage of justice." (Citations omitted.) *Id.*

The jury in this case convicted defendant of murder. Pursuant to the trial court's instructions, the jury was not to consider whether defendant was guilty of voluntary manslaughter unless it was unable to reach a verdict on the murder charge.[4] Accordingly, this court cannot find that the outcome of this case would have clearly been different if the trial court had correctly instructed the jury regarding the burden of proof on the crime of voluntary manslaughter. Although the trial court erred in its instructions regarding voluntary manslaughter, therefore, those instructions did not constitute plain error and the second part of defendant's second assignment of error is overruled.

### C

■ Defendant's third assignment of error is that he was denied due process of law under both the Ohio and United States Constitutions because the trial court allowed the prosecutor, on several occasions, to refer to the fact that defendant's explanation of the shooting changed after he first met with his attorney. Defendant has argued that these references prevented him from fully exercising his constitutional right to counsel.

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." Section 10, Article I of the Ohio Constitution also mandates that criminal defendants have a right to assistance of counsel. In calling attention to the fact that defendant's explanation of events regarding the shooting changed after he became represented by counsel,

---

**4.** In *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, certiorari denied (1989), 493 U.S. 826, 110 S.Ct. 89, 107 L.Ed.2d 54, the Ohio Supreme Court held that a jury is not required to determine unanimously that a defendant is not guilty of a particular offense before it may proceed to consider a lesser included offense. Defendant did not assign as error that part of the trial court's instructions in this case that directed the jury that it could not consider whether defendant was guilty of voluntary manslaughter unless it was unable to agree on a verdict of either guilty or not guilty of murder.

the prosecutor attacked the credibility of defendant's testimony by implying that defendant's explanations changed after he became aware of the law of self-defense. Nevertheless, the defendant was represented by counsel at trial and the prosecutor's remarks did not prevent him from being so represented. Defendant's third assignment of error is overruled.

## D

Defendant's fourth assignment of error is that the defendant's conviction was against the manifest weight of the evidence. If this court were to find defendant's conviction to be against the manifest weight of the evidence, defendant would be entitled to a new trial, but not to acquittal. See Section 3(A)(2), Article IV, Ohio Constitution. This court has already determined, based upon defendant's second assignment of error, that this case must be reversed for a possible new trial. If the state determines to retry defendant, the issue of whether a conviction resulting from that new trial is supported by the manifest weight of the evidence will necessarily depend upon the evidence presented at that new trial. Accordingly, defendant's fourth assignment of error is moot and, for that reason, is overruled.

## E

Defendant's fifth assignment of error is that he was denied effective assistance of counsel in violation of the Ohio and United States Constitutions. Defendant has argued that his trial counsel was ineffective in three ways.

■ First, defendant has argued that his trial counsel failed to consistently object to remarks made by the prosecutor that "repeatedly raised the inference that the defense of self-defense was manufactured by [defendant] after consultation with trial counsel." Appellant's Brief at 26. As mentioned in this court's disposition of defendant's third assignment of error, the prosecutor's remarks did not violate defendant's constitutional right to counsel. Accordingly, defendant's trial counsel was not ineffective in failing to consistently object to those remarks.

■ Second, defendant has argued that his trial counsel failed to make a formal proffer of the testimony of witnesses other than defendant regarding specific incidents of Banks's violent behavior. As discussed in this court's disposition of defendant's first assignment of error, the trial court properly excluded testimony from witnesses other than defendant about specific incidents of Banks's violent behavior. Accordingly, defendant's counsel was not ineffective by failing to make a formal proffer of the excluded testimony.

■ Finally, defendant has argued that his trial counsel was ineffective because he failed to object to the erroneous jury instruction regarding the burden

of proof on the offense of voluntary manslaughter. In order to establish ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonable representation and that there is a "reasonable probability" that he was prejudiced by that performance. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142–143, 538 N.E.2d 373, 379–381, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768. If defendant fails to establish either component, he is not entitled to relief. It is not necessary to consider the components in a particular order. If defendant has failed to establish a reasonable probability of prejudice, there is no need to consider whether counsel's performance fell below the standard of reasonable representation. *Id.*, 42 Ohio St.3d at 143, 538 N.E.2d at 380–381.

As discussed in regard to defendant's second assignment of error, the jury in this case was directed, pursuant to a part of the trial court's instructions that defendant has not challenged on appeal, not to consider whether defendant was guilty of voluntary manslaughter unless it was unable to reach a verdict on the murder charge against him. Inasmuch as the jury found defendant guilty of murder, it did not reach the erroneous jury instruction regarding the burden of proof on the offense of voluntary manslaughter. Accordingly, this court cannot conclude that there is a "reasonable probability" that defendant was prejudiced by his counsel's failure to object to that erroneous instruction. Defendant's fifth assignment of error is overruled.

### III

Defendant's second assignment of error is sustained in part and overruled in part. Defendant's first, third, fourth, and fifth assignments of error are overruled. Defendant's conviction of murder is reversed and this case is remanded to the Lorain County Court of Common Pleas for further proceedings consistent with this opinion.

*Judgment accordingly.*

COOK, P.J., and BAIRD, J., concur.