OPINION
{¶ 1} Defendant-appellant, Tyrone Smith, appeals from a judgment of the Franklin County Court of Common Pleas convicting him, following a jury trial, of voluntary manslaughter with a firearm specification. Defendant sets forth the following five assignments of error:
Assignment of Error No. 1:
Defendant-Appellant was denied his right to due process and a fundamentally fair jury trial as well as his right to a meaningful opportunity to present a defense under U.S. Const. [A]mend. V, VI and XIV, Ohio Const. [A]rt. I, § 10 and 16, and the common law of this state, as a result of (a) the trial court's instruction to the jury that "the affirmative defense of self-defense is not available for the lesser [included] offense of voluntary manslaughter" and (b) the arguments by the prosecutor to the same effect.
Assignment of Error No. 2:
Defendant-Appellant was denied his right to due process and a fundamentally fair jury trial as well as his right to a meaningful opportunity to present a defense under U.S. Const. [A]mend. V, VI and XIV, Ohio Const. [A]rt. I, § 10 and 16, and the common law of this state, as a result of (a) the misstatements of law by the prosecutor during closing argument to the effect that to be entitled to exercise the privilege of self-defense in his own home, Defendant-Appellant had a duty to remain confined in his bedroom while his assailant waited for him outside the bedroom door with a weapon in his hand and (b) the omission of a "Peacock" instruction in the general charge on self-defense regarding the accused's right to use deadly force, if necessary, to repel his assailant from his home.
Assignment of Error No. 3:
Defendant-Appellant was denied his right to due process and a fundamentally fair jury trial under U.S. Const. [A]mend. V, VI and XIV and Ohio Const. [A]rt. I, § 10 and 16 as a result of the prosecutor's decision to wait until the close of the State's case before revealing that he was not prepared to prove the felony conviction underlying the two weapons under disability counts of the indictment. Proceeding on the assumption that evidence regarding the prior conviction would be introduced into evidence to prove those counts, defense counsel and the trial judge made disclosures and comments to the prospective jurors during the voir dire proceedings that exposed them to otherwise inadmissible and damaging information regarding Defendant-Appellant's character and infringed upon his constitutional right to remain silent.
Assignment of Error No. 4:
Defendant-Appellant was denied his right to the effective assistance of counsel guaranteed to him under U.S. Const. [A]mend. VI and XIV as a result of defense counsel's failure (a) to take the corrective action necessary to protect his client's rights with respect to the errors that are the subject of Assignments of Error Nos. 1, 2 and 3, and (b) to request an instruction on the lesser included offense of reckless manslaughter.
Assignment of Error No. 5:
The maximum prison term imposed by the court of common pleas is not supported by the evidence and is contrary to law.
 {¶ 2} In spring 2002, defendant and Joanne Hayes moved to Columbus from Youngstown and lived together as a couple in an apartment on the city's west side. Braeon Kitchen, Hayes' eight-year-old grandson, lived with them. By summer 2003, problems had surfaced in the couple's relationship; however, they continued to live together and remained somewhat romantically involved.
 {¶ 3} In mid-July 2003, Hayes' 13-year-old great-nephew, Joshua Walker, came to visit for a few days. Around the same time, Mark Williams, a self-employed house painter and friend of Hayes from Youngstown, moved in temporarily while he did some painting for Hayes' son. Although Williams expressed romantic interest in Hayes, Hayes was not interested in a relationship because she knew that Williams sometimes became violent when he drank too much.
 {¶ 4} On July 25, 2003, Williams was fired from his painting job. He returned to the apartment and began drinking heavily. By the time Hayes returned home from work at 7 p.m., Williams was intoxicated. At Williams' urging, Hayes agreed to have a few drinks with him outside on the porch.
 {¶ 5} At around 11 p.m., Hayes told Williams she was going to bed. Hayes went into the bedroom she shared with defendant and found him watching television. The two argued loudly over the fact that defendant had been out late the previous evening. Defendant left the bedroom and went into the living room, where Williams confronted him. Williams told defendant to calm down and "treat [Hayes] right." (Tr. Vol. II, 209.) Defendant told Williams to stay out of his business. The two exchanged more heated words and then began wrestling. During the struggle, Williams twice threw defendant to the floor. Williams then picked up a brass candlestick from a nearby table and raised it in a threatening manner.
 {¶ 6} Defendant went back into the bedroom and told Hayes that Williams had "called [him] out." (Tr. Vol. I, 123.) Hayes noticed Williams standing just outside the bedroom door holding the candlestick. She told him to stay out of the bedroom; Williams complied with that order. According to Walker, who had been watching the scene from the kitchen, Williams put the candlestick down and was "huffing and puffing" like he was tired from the wrestling match. (Tr. Vol. II, 225.)
 {¶ 7} In the meantime, defendant put on a shirt and shoes and left the bedroom, armed with a handgun Hayes kept under the bed. Defendant returned to the living room and called Williams a "bitch." (Tr. Vol. II, 212.) Williams retorted that defendant was a "bitch" because he had retrieved a gun. Id. The name-calling escalated to a physical altercation, which eventually moved toward the front door. According to Walker, defendant struggled to resist Williams' efforts to push him out the front door. At that point, Hayes ordered Walker to join her in the bedroom. Shortly thereafter, Walker and Hayes heard two or three gunshots, approximately five seconds apart.
 {¶ 8} When the shooting stopped, Hayes and Walker returned to the living room and found Williams slumped against the wall just inside the front door. Hayes called 911; Columbus police and emergency medical personnel arrived shortly thereafter. Williams was transported to a nearby hospital, where he later died.
 {¶ 9} One of the responding police officers aired a description of defendant over the police radio. Shortly thereafter, defendant was apprehended in a nearby wooded area without incident. Hayes' gun was found in the area. Two shell casings were found on the landing outside the front door.
 {¶ 10} An autopsy revealed that Williams sustained three gunshot wounds to the chest, right hip and left thigh; the chest wound was fatal. Ballistics testing established that two spent bullet fragments recovered from Williams' body were fired from Hayes' gun. A toxicology analysis showed that Williams' blood-alcohol level was .20. DNA testing revealed that Williams' blood was on defendant's shoe and trouser leg; defendant's own blood was on his injured left hand.
 {¶ 11} A police report filed after the incident did not denote that a candlestick was found near Williams' body. Crime scene photographs depicted a candlestick sitting on a table in the center of the living room.
 {¶ 12} On August 5, 2003, defendant was indicted on one count of aggravated murder with a firearm specification in violation of R.C. 2903.01 and 2941.145, respectively, and two counts of having a weapon while under disability in violation of R.C. 2923.13.
 {¶ 13} At the close of the state's evidence, the trial court dismissed both having a weapon while under disability charges. Following closing arguments, the trial court instructed the jury on the charges of aggravated murder, the lesser included offenses of murder and voluntary manslaughter, and the affirmative defense of self-defense. The jury found defendant not guilty of aggravated murder, but guilty of voluntary manslaughter in violation of R.C. 2903.03 and the specification that the offense was committed with a firearm in violation of R.C. 2941.145. The trial court sentenced defendant to ten years imprisonment on the voluntary manslaughter charge with an additional three years for use of a firearm.
 {¶ 14} By his first assignment of error, defendant asserts that the trial court erroneously instructed the jury that "[t]he affirmative defense of self-defense is not available for the lesser [included] offense of voluntary manslaughter." (Tr. Vol. II, 337.) Defendant further contends the prosecution compounded the trial court's error by improperly asserting in closing argument that "[s]elf-defense does not apply to voluntary [manslaughter]." (Tr. Vol. II, 287.) Defendant did not object to either the trial court's instruction or the prosecution's statement. The state concedes that both the trial court's instruction and the prosecution's argument were erroneous, but contends that such errors do not rise to the level of plain error because the evidence at trial was insufficient to warrant a jury instruction on self-defense.
 {¶ 15} It is well-settled that a failure to object to jury instructions before the jury retires, absent plain error, constitutes a waiver. State v. Williford (1990),49 Ohio St.3d 247, 251. Similarly, a failure to object to the prosecution's closing argument, absent plain error, constitutes a waiver.State v. Slagle (1992), 65 Ohio St.3d 597, 604. The plain error doctrine permits a reviewing court to take note of plain errors or defects affecting substantial rights, even though such errors were not brought to the attention of the trial court. See Crim.R. 52(B); State v. Long (1978), 53 Ohio St.2d 91, 94. The doctrine is to be used cautiously and only under exceptional circumstances to prevent a manifest miscarriage of justice. Id. Plain error will not be found unless the outcome of the trial would clearly have been different. Williford, at 253; Slagle, supra.
 {¶ 16} Under Ohio law, self-defense is an affirmative defense, which the defendant must prove by a preponderance of the evidence. R.C. 2901.05; Williford, at 249. An accused is entitled to claim self-defense after satisfying three conditions. First, the accused must not be at fault in creating the situation giving rise to the dispute. Id. Next, the accused must have had an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force. Id. The Ohio Supreme Court has stated that this test is both objective and subjective. State v.Thomas (1997), 77 Ohio St.3d 323, 330. The jury "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] reasonably believed [he] was in imminent danger. * * * Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that [he] was in imminent danger." Id. at 330-331. (Emphasis sic). Thus, "self-defense `is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" Id. at 330, (emphasis sic.), quoting Statev. Sheets (1926), 115 Ohio St. 308, 310. Finally, the accused must not have violated any duty to retreat or avoid the danger.Williford, supra. However, there is an exception to the third element when the accused is in his own home. Id. This exception extends to situations where the accused and the assailant cohabit in the same abode. "There is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with [an] equal right to be in [the] home." Thomas,
supra, syllabus.
 {¶ 17} The elements of self-defense are cumulative. State v.Jackson (1986), 22 Ohio St.3d 281, 284. The trial court need not give an instruction on self-defense if every element of the defense is not raised by the evidence. Conversely, a trial court must instruct on self-defense if every element is raised by the evidence.
When such evidence is forthcoming the trial court must first, viewing that evidence in the light most favorable to the defendant, determine whether or not it is adequate to raise the self-defense issue, and, if believed, would under the legal tests applied to a claim of self-defense permit a reasonable doubt as to guilt, stemming from that claim, to arise. * * * If the evidence adduced, so viewed, is legally insufficient to raise the issue, the trial court will have no occasion or obligation to instruct the jury on the elements essential to a valid claim of self-defense * * * from jury consideration.
State v. King (Nov. 10, 1997), Seneca App. No. 13-97-12, quoting Bucyrus v. Fawley (1988), 50 Ohio App.3d 25, 26-27. (Emphasis omitted; citations omitted.)
 {¶ 18} The state contends that a self-defense instruction was not warranted on voluntary manslaughter because the evidence at trial was insufficient to raise an issue with regard to either the first or second elements.
 {¶ 19} The evidence at trial, construed in a light most favorable to defendant, arguably raises a question of fact about who was responsible for the situation that ultimately led to Williams' death. Hayes testified that Williams had been fired from his job and was drinking heavily. By 7 p.m. he was intoxicated, and he continued to drink heavily for the next four hours. Hayes further testified that Williams was violent when he was intoxicated. After Hayes and defendant argued, an intoxicated Williams, who had expressed some romantic interest in Hayes, confronted defendant about defendant's relationship with her. The evidence is unclear as to how the physical altercation between defendant and Williams began; however, Walker testified that Williams twice threw defendant to the floor. Both Hayes and Walker testified that Williams threatened defendant with a candlestick. Construing these facts in favor of defendant, a reasonable jury, properly instructed, may have reasonably inferred that defendant was not a fault in creating the situation giving rise to the dispute.
 {¶ 20} Similarly, the evidence at trial, construed in a light most favorable to defendant, arguably raises a question of fact concerning whether defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that he could escape such danger only by using deadly force. As noted previously, the evidence at trial established that Williams had violent propensities when he was intoxicated and that he verbally criticized defendant about defendant's relationship with Hayes. The evidence further established that Williams, a much larger man than defendant, threw defendant to the floor twice during their first physical altercation and then threatened him with a candlestick. When defendant went into the bedroom, Williams waited for him outside the bedroom door, armed with the candlestick. Defendant did not shoot Williams immediately after he emerged from the bedroom with the gun; rather, the two engaged in a second physical altercation. Although it is unclear exactly what transpired in the moments preceding the shooting, a properly instructed jury might reasonably have inferred from the surrounding facts and circumstances that Williams' aggressive actions leading up to the shooting could have caused defendant to believe that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of deadly force.
 {¶ 21} In short, construing the facts in a light most favorable to defendant, sufficient evidence was adduced at trial to justify a self-defense charge to voluntary manslaughter. Thus, under the circumstances of this case, the trial court's erroneous instruction, compounded by the prosecution's erroneous statement, completely deprived defendant of his only possible defense to the voluntary manslaughter charge. Defendant admitted that he shot Williams. Since the jury had decided to acquit defendant of aggravated murder and murder, the trial court's instruction left the question of whether he was guilty of voluntary manslaughter open and shut for the jury. In other words, defendant having conceded that he fired the fatal shot, the trial court's instruction assured the prosecution a conviction on voluntary manslaughter, even if the jury were to find that defendant killed Williams in self-defense. The effect of the trial court's erroneous instruction and the prosecution's argument was to completely deprive defendant of his defense — on which he had at least a reasonable possibility of prevailing — and to ensure his conviction.
 {¶ 22} A criminal defendant has a right under theSixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be afforded a meaningful opportunity to present a complete defense to a properly instructed jury. Barker v. Yukins (C.A.6, 1999), 199 F.3d 867,875, citing California v. Trombetta (1984), 467 U.S. 479, 485,104 S.Ct. 2528. Here, instead of having a meaningful opportunity to present a full and vigorous defense, defendant's claim of self-defense was completely eviscerated by the trial court's instruction that self-defense does not apply to voluntary manslaughter. Under the circumstances, it cannot be presumed that the jury would not have acquitted defendant had it been properly instructed. Thus, the trial court's error, compounded by the prosecution's erroneous statement, constituted plain error, resulting in the conclusion that defendant must be given a new trial. Accordingly, the first assignment of error is well-taken.
 {¶ 23} In his second assignment of error, defendant contends the prosecution improperly asserted in closing argument that defendant's decision to return to his bedroom, retrieve a gun, and then expel Williams from the apartment precluded him from relying on the defense of self-defense. Defendant further contends the trial court erred in omitting from its general charge on the third element of self-defense the "Peacock" instruction found in 4 Ohio Jury Instructions (2003), Section 411.31(4), which delineates the right of a defendant who has been attacked in his own home to use such force as is reasonably necessary, including deadly force, to repel an assailant from the defendant's home. Defendant failed to object to either the prosecution's argument or the trial court's instruction and, therefore, to prevail on appeal must demonstrate plain error.
 {¶ 24} In its initial portion of closing argument, the prosecution commented that: "[d]efendant is not in a position to claim self-defense under this circumstance if he's seeking trouble and he's armed and he's provoking a fight or he's renewing a fight that had broken off and did not attempt to avoid it or to leave the scene of the trouble. He went directly to the scene of the trouble. He could have stayed in that back bedroom. I know it's a little degrading. But you know what? Just stay in the bedroom till [sic] the drunk calms down for heaven's sake, you know, be a grownup." (Tr. Vol. II, 292.) The prosecution continued: "There is nothing to indicate that if he had stayed in the bedroom with the gun that * * * the matter wouldn't have resolved. You know, he put the candlestick down. * * * Joshua thinks it's over, it's a dead issue. So just swallow your pride a little bit, stay in the bedroom." Id. at 292-293.
 {¶ 25} In its rebuttal portion of closing argument, the prosecution again emphasized that "[defendant] could have stayed in the bedroom. Degrading, I admit, certainly not an ideal way to spend an evening, but he could have been in the bedroom." Id. at 318.
 {¶ 26} The trial court's charge on the duty to retreat element of self-defense instructed the jury, in pertinent part, that:
* * * [W]here a person in the lawful pursuit of his business on his own premises, and without blame, is violently assaulted by another who manifestly and maliciously intends and endeavors to kill him, the person so assaulted, without retreating, although it be in his power to do so without increasing his danger, may kill his assailant if necessary to save his own life or prevent enormous bodily harm.
(Tr. Vol. II, 336-337.)
 {¶ 27} In State v. Peacock (1883), 40 Ohio St. 333, the Ohio Supreme Court held that "[w]here one is assaulted in his home * * * he may use such means as are necessary to repel the assailant from the house * * * even to the taking of life. But a homicide in such a case would not be justifiable unless the slayer, in the careful and proper use of his faculties, bonafide believes, and has reasonable ground to believe that the killing is necessary to repel the assailant." (Emphasis sic.) Id. at paragraph two of the syllabus.
 {¶ 28} In State v. Cuttiford (1994), 93 Ohio App.3d 546, the defendant and the victim lived in separate apartments in the same duplex. After the victim and the defendant engaged in an intense verbal confrontation on a common stairway, the defendant ran into the kitchen entrance of his apartment, closed the door behind him, and retrieved two guns he kept in the bedroom. He returned to the kitchen door armed with both guns, opened the door, and pointed one of the guns at the victim, who by this time had come to the landing outside the kitchen door. The victim told defendant he was going to kill him. The defendant, standing about a foot inside his apartment, shot the victim as the victim "crouched and lunged at him." Id. at 551. The defendant argued that the trial court's general instructions on self-defense were incomplete because the court refused to instruct the jury that when a person is within his own home he has no duty to retreat.
 {¶ 29} The court of appeals determined that the trial court erroneously failed to instruct the jury that "defendant, once he was inside his own apartment, was privileged to use such means as were necessary to prevent [the victim] from entering the apartment and was not required to retreat to avoid further confrontation with him." Id. at 558. The court stated that once the defendant reached his own apartment, he had no duty to retreat any farther. Further, once he was in his bedroom, he was not required to remain there. "Implicit in the privilege to use necessary force to repel an intruder from one's own home is the opportunity to move about within the sanctuary of that home to retrieve an available weapon. Also implicit in that privilege is that a person is not under a duty to wait for an anticipated intruder in the part of the home most distant from the location at which he expects the intruder to enter." Id.
 {¶ 30} In this case, the state contends the court's instruction on the duty to retreat was adequate because this court approved the same instruction in State v. Fisher (Mar. 12, 1996), Franklin App. No. 95APA04-437. However, the state's argument fails to acknowledge that jury instructions must be tailored to adequately and correctly convey the law applicable to the particular issues raised by the evidence in a particular case. State v. Guster (1981), 66 Ohio St.2d 266, 271.
 {¶ 31} In Fisher, the victim, John "Beau" Hinkle, lived with his long-time girlfriend, Sherry Thomas. Sherry's mother, Sharon Fischer, and her boyfriend, Darrell Fisher ("defendant"), moved in with Beau and Sherry, occupying the upstairs bedroom of the residence. After friction developed between Beau and Sharon, Beau made it clear he wanted Sharon and defendant to move out of the residence.
 {¶ 32} When Beau returned home after a night of drinking, he and Sherry argued over Sharon's and defendant's continued presence in the home. Defendant and Sharon were in the upstairs apartment and overheard the argument. After hearing a loud crash and the sound of Sherry screaming as if she had been injured, Sharon picked up the telephone to call the police. Almost immediately thereafter, Beau headed up the stairs and kicked open the locked door to Sharon's and defendant's bedroom. The angle of Beau's attack blocked the couple's only reasonable means of escape. Defendant shot Beau in the chest with a shotgun. Beau survived the gunshot blast and eventually recovered.
 {¶ 33} Fisher is distinguishable because the evidence in that case did not raise the issue raised by the evidence in the instant case, i.e., whether a defendant is privileged, after an initial confrontation with an assailant in one area of the defendant's residence, to leave that area, retrieve a weapon from another area of the residence, return to the location of the initial confrontation and use the weapon to expel the assailant from the residence. In Fisher, the defendant shot the victim after the victim barged into a room already occupied by the defendant. The defendant apparently had a weapon at his disposal in the bedroom and thus had no need to leave that room to retrieve a weapon. Thus, no instruction regarding the issue raised by the evidence in the instant case was warranted inFisher.
 {¶ 34} Here, the prosecution repeatedly argued that defendant's right of selfdefense terminated once he retreated to the bedroom and that he had a legal duty to remain there. However, defendant's right of self-defense was much broader than that set forth by the prosecution. Pursuant to Peacock andCuttiford, defendant had no legal duty to remain in the bedroom and wait for Williams to confront him there. Rather, the privilege to use necessary force to repel Williams from his home included the right to retrieve a weapon from the bedroom, return to the living room, and use the weapon to repel Williams from his home. The trial court could have cured the prosecution's misstatement by providing the jury with a proper instruction. Unfortunately, the court instructed the jury that "[a] Defendant is not in a position to claim self-defense if he sought trouble and armed with a dangerous weapon, he provoked a fight or renewed a fight that had broken off and did not attempt to avoid it or leave the scene of the trouble." (Tr. Vol. II, 336.) This language is nearly verbatim to that employed by the prosecution, and may have reinforced in the jury's mind the false impression that defendant was not privileged to leave the bedroom and use the force reasonably necessary to expel Williams from his home.
 {¶ 35} A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence. Williford, supra, at 251. The problem with the trial court's instruction on self-defense is not that it was incorrect per se, but that it was inadequate for the task of placing before the jury for its consideration the fact that defendant was not required to remain in the bedroom and could use the force necessary to repel Williams from his home. Considering that the state argued that defendant should have remained in the bedroom, the jury, which was not instructed on the Peacock orCuttiford rules, may have incorrectly believed that defendant had the duty to remain in the bedroom and take no action to repel Williams from the apartment. Under the particular facts and circumstances of this case, the prosecution's misstatement of the law, uncured by the trial court's failure to properly instruct the jury, admittedly exacerbated by the failure of defense counsel to object, constitutes plain error, as it cannot be presumed that the jury would not have acquitted defendant had it been properly instructed. The second assignment of error is well-taken.
 {¶ 36} Defendant's third, fourth, and fifth assignments of error raise issues regarding prosecutorial misconduct, ineffective assistance of counsel, and improper sentencing, respectively. The resolution of defendant's first and second assignments of error has rendered these assignments of error moot. See App.R. 12(A)(1)(c).
 {¶ 37} For the foregoing reasons, the first and second assignments of error are sustained, rendering the third, fourth and fifth assignments of error moot. Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed and the matter is remanded for a new trial.
Judgment reversed and cause remanded.
Bryant and Klatt, JJ., concur.
McCormac, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.