JOURNAL ENTRY and OPINION
{¶ 1} A jury found defendant Tyrone Loyed guilty of one count of aggravated murder and one count of having a weapon while under a disability. The charges stemmed from the shooting death of Clifford Ford. Loyed admitted to shooting Ford, but argued that he did so in self-defense. The four assignments of error raised in this appeal make challenges to the jury instructions, the admission of evidence, and prosecutorial misconduct.
 {¶ 2} Loyed did not dispute the evidence concerning the events leading up to the shooting. Ford and his girlfriend lived in a small apartment with the girlfriend's stepdaughter. Loyed supplied drugs to the girlfriend. On the evening of the murder, Loyed stopped by to deliver drugs to the girlfriend. The girlfriend suggested that the stepdaughter go out for drinks with Loyed. After Loyed arrived at the apartment, he and the girlfriend went into the bedroom. They came out a short time later and Loyed and the stepdaughter left. They reached the elevator before receiving a cell phone call asking them to return — Loyed had taken the girlfriend's cigarettes and she wanted them back. When they went back into the apartment, the girlfriend seemed upset to the stepdaughter. They went into the bedroom to talk. The stepdaughter learned that Ford had been angry about something. As they spoke, they heard thumping noises. They exited the bedroom to find Ford and Loyed fighting. Ford had pinned Loyed to the ground before the women could separate them.
 {¶ 3} After stopping the fight, Loyed and the stepdaughter left the apartment so that Loyed could make the rounds with his other drug customers. During the course of these rounds, the stepdaughter called the girlfriend to make sure that everything had been resolved. Loyed took the phone and spoke to the girlfriend, apologizing to her for fighting. Loyed then asked if he could speak with Ford. Ford hung up on Loyed.
 {¶ 4} When Loyed and the stepdaughter returned to the apartment, Loyed went to the bedroom that Ford shared with the girlfriend; the stepdaughter went to the kitchen. The stepdaughter could hear arguing from the bedroom, and then heard the click of a semi-automatic gun. The girlfriend said that Loyed entered the bedroom and said to Ford, "who's the bitch now?" Ford grabbed his girlfriend and held her between him and Loyed. Ford backed out of the bedroom, using the girlfriend as a human shield. Loyed walked forward with a gun aimed at Ford and the girlfriend. Loyed mocked Ford for hiding behind a woman, telling the girlfriend that Ford was a "bitch-ass man." Loyed told Ford to let the girlfriend go, but Ford refused. The girlfriend pleaded to be released, telling Ford that Loyed would not shoot him. Ford released the girlfriend and she headed for the bathroom. The stepdaughter was in the kitchen. Both the girlfriend and stepdaughter heard gunshots, with the girlfriend recalling that Ford said, "Man, you shot me."
 {¶ 5} The stepdaughter looked to see Loyed standing over Ford pointing the gun at him. She ran over and tried to help Ford to his feet, then ran into the bedroom and out onto a balcony. Ford followed the stepdaughter into the bedroom and dove behind the bed. Loyed entered the bedroom. The stepdaughter heard more gunshots and then heard what sounded like the gun being beaten against something.
 {¶ 6} The forensic evidence showed that Loyed shot Ford six times. Four of the shots were fired into Ford's trunk; the other two struck a forearm and thigh. The most serious of the shots struck the chest and perforated Ford's lung.
 {¶ 7} After the shooting, Loyed told the girlfriend to "clean this shit up" and had the stepdaughter help him take the still-breathing Ford to the stairwell where Loyed dragged Ford seven floors to the ground level. A resident in the building heard a commotion in the stairwell and heard someone say, "I should have cut his F'ing heart out of him." Loyed put Ford in the trunk of his car and told the stepdaughter to get in the car. He took her to the home of a friend where she called the police and reported what happened.
 {¶ 8} The following day, police officers unwittingly tried to pull over Loyed's car for the purpose of issuing him a traffic citation. In making a routine record check of the vehicle, they discovered that he had an outstanding murder warrant. When they moved to stop him, Loyed tried to escape. After a short pursuit, Loyed "bailed" out of his car and ran until the police cornered him. They returned Loyed to the zone car and found Ford's body in the trunk of Loyed's car. Loyed told the police that he disposed of the victim's clothing and weapon in a dumpster, but the police found that the dumpster had been emptied before they could retrieve that evidence.
 I {¶ 9} At trial, Loyed claimed self-defense and the court instructed the jury on that defense. Nevertheless, Loyed asked the court to instruct the jury on the lesser included offense of voluntary manslaughter. The court refused the instruction. Both parties agree that involuntary manslaughter is a lesser included offense of murder, see State v. Tyler (1990), 50 Ohio St.3d 24,36, so the issue is whether the evidence would have reasonably supported the charge.
 {¶ 10} We preface our discussion of this assignment of error by noting that Loyed mistakenly refers to "involuntary" manslaughter, even though his argument leaves no doubt that he wanted a "voluntary" manslaughter instruction. Loyed argues facts which suggest that he acted "under the influence of sudden passion or in a sudden fit of rage" — the very definition of voluntary manslaughter. See R.C. 2903.04(A). Involuntary manslaughter is committed when a person causes the death of another as a proximate result of committing or attempting to commit a felony. See R.C. 2903.04(A).
 {¶ 11} Despite the incorrect nomenclature, we find that the court did not err by refusing to instruct on the lesser included offense of voluntary manslaughter because the requested instruction was incompatible with Loyed's theory of self-defense. In State v. Harris (1998), 129 Ohio App.3d 527, 534-535, the court of appeals stated:
 {¶ 12} "Appellant incorrectly contends that the same evidence that supported his claim of self-defense and defense of others also supported his request for an instruction on voluntary manslaughter. As noted above, voluntary manslaughter requires that the defendant be under the influence of sudden passion or a fit of rage. Thus, this court has held that evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own and other's personal safety, does not constitute sudden passion or fit of rage as contemplated by the voluntary manslaughter statute. See State v. Tantarelli, 1995 Ohio App. LEXIS 2186 (May 23, 1995), Franklin App. No. 94APA11-1618, unreported (1995 Opinions 2144, 2151) (testimony that defendant was dazed, confused, and scared was insufficient to show sudden passion or fit of rage); State v. Thompson, 1993 Ohio App. LEXIS 1198 (Feb. 23, 1993), Franklin App. No. 92AP-1124, unreported (1993 Opinions 485, 489) (`Self defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage.').
 {¶ 13} "While appellant relies extensively on this court's decision in State v. Roddy, 1981 Ohio App. LEXIS 10292 (Nov. 17, 1981), Franklin App. No. 81AP-499, unreported (1981 Opinions 3706), for the proposition that fear for one's own safety is sufficient to warrant a voluntary manslaughter instruction, such reliance is misplaced. At the time Roddy was decided, the voluntary manslaughter statute only required that the defendant establish that he was `under extreme emotional stress.' See id. at 3708. However, given that voluntary manslaughter now requires that the defendant be under the influence of `sudden passion or fit of rage,' the position advanced by appellant and supported byRoddy cannot be presently maintained. * * * Simply put, `fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.' State v.Mack (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (upholding refusal to grant an aggravated assault instruction when defendant testified that he acted out of self-defense)." (Citation omitted.)
 {¶ 14} A jury instruction on a lesser included offense "is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas
(1988), 40 Ohio St.3d 213, paragraph two of syllabus. As Harris
makes clear, self-defense requires that the defendant show evidence of fear, while voluntary manslaughter requires that the defendant show evidence of sudden passion or fit of rage. It must be one or the other. The court did not err by finding that Loyed could not assert both.
 II {¶ 15} To bolster his case of self-defense, Loyed attempted to show that he returned to the apartment with the stepdaughter because he wanted to have sex with her. This, he believed, would show his state of mind in returning to the apartment and would refute the state's allegation that he returned to the apartment with prior calculation and design to kill Ford. The court refused to let Loyed testify to his intentions towards the stepdaughter, and Loyed now complains that the court abused its discretion by limiting his testimony.
 A {¶ 16} All relevant evidence is admissible, except as otherwise provided by the Rules of Evidence. Evid.R. 402. The term "relevant evidence" is also defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. However, Evid.R. 403(A) provides that, although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The court retains sole discretion in admitting evidence, and we cannot overturn the court's decision in that regard absent an abuse of discretion. State v. Sage
(1987), 31 Ohio St.3d 173.
 {¶ 17} The court did not abuse its discretion by refusing to allow Loyed to testify about specific instances of the stepdaughter's sexual past in order to explain his reasons for returning to the apartment. Loyed had fully conveyed to the jury his desire to return to the apartment with the intention of pursuing sexual relations with the stepdaughter. He did not need to bring in hearsay statements about the stepdaughter's past to underscore that desire. And more to the point, evidence relating to the stepdaughter's proclivity for sexual relations did nothing to give further explanation to his reasons for returning to the apartment. Statements about the stepdaughter's sexual history would thus have been purely cumulative and would only have served to embarrass the stepdaughter. The court has the authority to control the presentation of evidence to prevent undue embarrassment to witnesses. See Evid.R. 611(A).
 B {¶ 18} Likewise, the court did not abuse its discretion by refusing to permit Loyed to give hearsay testimony relating to Ford's reputation for violence. Evid.R. 404(A) specifies when character evidence is admissible and provides:
 {¶ 19} "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:
 {¶ 20} "* * *
 {¶ 21} "(2) Character of the victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable."
 {¶ 22} Evid.R. 405 states that when evidence of character or trait of character is admissible, proof can be made by testimony as to reputation.
 {¶ 23} In State v. Barnes, 94 Ohio St.3d 21, 24,2002-Ohio-68, the Supreme Court dealt with the same issue raised here — Barnes asserted that he acted in self-defense and wished to introduce evidence of the victim's reputation for violence. The court stated:
 {¶ 24} "It is undisputed that a defendant can introduce character evidence by reputation or opinion testimony under Evid.R. 405(A). See, e.g., State v. Baker (1993),88 Ohio App.3d 204, 210-211, 623 N.E.2d 672, 676. But Evid.R. 405(B) is more narrowly drawn. Thus, the relevant inquiry in this case is whether a victim's character or character trait is an essential element of self-defense. If the proof or failure of proof of the victim's character would not be dispositive of an element of self-defense, then it is not an essential component of the defense and falls outside the limited scope of Evid.R. 405(B).
 {¶ 25} "To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. State v. Robbins (1979), 58 Ohio St.2d 74, 12 Ohio Op.3d 84, 388 N.E.2d 755, paragraph two of the syllabus. Although a victim's violent propensity may be pertinent to proving that he acted in a way such that a defendant's responsive conduct satisfied the elements of self-defense, no element requires proof of the victim's character or character traits. A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character. Therefore, Evid.R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor. State v. Cuttiford (1994), 93 Ohio App.3d 546, 555,639 N.E.2d 472, 478; State v. Baker, 88 Ohio App.3d at 210-211,623 N.E.2d at 676; State v. Carlson (1986), 31 Ohio App.3d 72,74, 31 Ohio B. Rep. 112, 115, 508 N.E.2d 999, 1001." (Footnote omitted.)
 {¶ 26} Loyed argues, in essence, that Barnes is incorrect. Regardless what Loyed believes, as a lower court we are bound by a decision of the Ohio Supreme Court. We must adhere to Barnes
and find that the court did not abuse its discretion by refusing to permit Loyed to testify to Ford's reputation for violence.
 III {¶ 27} During closing argument, the state told the jury that "if this was an accident, if this was an act of self-defense, if this was a mistake, he [Loyed] should have been balling his eyes out. The victim's family has been in the back of the room and * * *. The two people who witnessed the murder, other than the defendant, are upset. They are crying * * *. They witnessed a cold-blooded murder. * * * But he wants you to think that he thinks about this, not only everyday, but every hour. And he wishes he could take it all back if he could have, he would have taken it back a long time ago. But did you see any emotion." Loyed argues that this statement constituted prosecutorial misconduct because it improperly addressed victim-impact considerations.
 {¶ 28} The test for prosecutorial misconduct in closing arguments is "`whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" State v. Hessler, 90 Ohio St.3d 108, 125, Statev. Smith (1984), 14 Ohio St.3d 13, 14. When applying this test, we consider "the effect the misconduct had on the jury in the context of the entire trial." State v. Keenan (1993),66 Ohio St.3d 402, 410.
 {¶ 29} Victim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused — it principally serves to inflame the passion of the jury. See State v. White (1968), 15 Ohio St.2d 146. Nevertheless, the prosecution is given a great deal of latitude during closing arguments. See State v. Bies (1996),74 Ohio St.3d 320, 326. In State v. Smith, 80 Ohio St.3d 89, 111,1997-Ohio-355, the supreme court stated, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence. The prosecutor's reference to defendant's lack of remorse may have been intended to question his credibility." (Citations omitted.)
 {¶ 30} The context of the state's closing argument leaves us no doubt that it was intended as a comment on Loyed's credibility. The state told the jury that Loyed wished he could take back his actions, but his lack of emotion suggested otherwise. It noted that the girlfriend and stepdaughter comported themselves in a manner consistent with having witnessed a murder. This was not meant as a direct comment on the impact the murder had on the witnesses, but as a comment on Loyed's believability. Viewed as such, the state's comment was not error and no case of prosecutorial misconduct has been shown.
 IV {¶ 31} In his final argument, Loyed maintains that Ohio's self-defense statute is unconstitutional because it places the burden of proof upon the accused. See R.C. 2901.05(A). He bases this argument on two United States Supreme Court cases: Apprendiv. New Jersey (2000), 530 U.S. 466 and Ring v. Arizona (2002),536 U.S. 584. In Apprendi, the court interpreted the constitutional due-process and jury-trial guarantees to require that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Ring, the court applied the Apprendi principle to a death sentence imposed under a state of Arizona sentencing scheme. The court concluded that, because Arizona law authorized the death penalty only if an aggravating factor was present, Apprendi required the existence of such a factor to be proved to a jury rather than to a judge. Ring, 536 U.S. at 603-609. Loyed argues that Ohio requires the accused to disprove an element of the offense, thus shifting the burden of persuasion to the accused. Because of this, he maintains that we should view self-defense as an element of the offense.
 {¶ 32} Loyed's citation to Apprendi and Ring is not on point. Both cases dealt with situations where state statutes permitted the trial judge to make findings of fact that could increase a sentence beyond the statutory maximum. The United States Supreme Court held that this type of sentencing scheme violated the right to a jury trial because the accused had theSixth Amendment right to have issues of fact determined by a jury. In contrast, Ohio's self-defense statute does not increase the penalty beyond the maximum. Indeed, as an affirmative defense, self-defense is an admission of all essential elements of the charged crime, but with the legal recognition that the accused's actions were justified under the circumstances.
 {¶ 33} But any further discussion of this assignment of error would be pointless as we are bound the Supremacy Clause of the United States Constitution to follow all decisions of the United States Supreme Court. See State v. Burnett, 93 Ohio St.3d 419,422, 2001-Ohio-1581. In Martin v. Ohio (1987), 480 U.S. 228, the United States Supreme Court held that placing the burden of proving self-defense upon the accused did not violate due process. Until such time as the United States Supreme Court retracts its opinion in Martin, we are bound to follow it.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, J., and Rocco, J., concur.