JOURNAL ENTRY and OPINION
{¶ 1} The grand jury returned a four-count indictment against defendant Lewis Brown, charging him with one count of aggravated murder under R.C. 2903.01(A) [premeditation], one count of aggravated murder under R.C. 2903.01(B) [felony murder], one count of robbery and one count of carrying a concealed weapon. Each of the aggravated murder counts contained felony murder specifications. The charges stemmed from a robbery/murder of a store owner whom Brown and an accomplice followed as he left work and murdered outside the store owner's house. At the close of the guilty phase of trial, the jury found Brown guilty of all the charges. At the close of the penalty phase of trial, the jury returned a recommendation of life without parole on each of the aggravated murder counts. The court accepted the recommendation and sentenced Brown accordingly. Brown appeals and sets forth several trial errors which he believes entitles him to a new trial. Because none of the assigned errors challenges either the weight or sufficiency of the evidence, the relevant facts will be stated as necessary within our discussion of specific arguments.
 1. I {¶ 2} The grand jury charged Brown with alternative theories of aggravated murder, each with a capital specification as permitted by R.C. 2929.04. As to the capital specification, the court instructed the jury that if it found beyond a reasonable doubt that Brown committed murder while committing or attempting to commit aggravated robbery as a principal offender, "or if not the principal offender, committed the aggravated murder with prior calculation or design, you must find him guilty of the felony murder specification." Brown argues that the court failed to charge the jury that it must find all of the elements of each specification separately and unanimously. He thus concludes that as to count 1, half of the jurors could have found him guilty of the felony murder specification while the other half could have found him guilty of the prior calculation and design specification.
 {¶ 3} Brown did not object to the court's jury instruction, so our review of the alleged error proceeds under the plain error analysis of Crim.R. 52(B). See State v. Moreland (1990),50 Ohio St.3d 58, 62-63. That being the case, we cannot reverse the conviction of the R.C. 2929.04(A)(7) death penalty specification "unless we determine that the outcome of appellant's trial would clearly have been otherwise had the error not occurred." Under the Crim.R. 52(B) plain error standard, it is up to Brown to show that (1) the court erred by failing to comply with a legal rule, (2) the alleged error was plain, and (3) the error affected his substantial rights. State v. Barnes (2002), 94 Ohio St.3d 21,27, 2002-Ohio-68. And we are cautious to invoke plain error in only exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 4} We also note that this argument is not mooted by the jury's failure to recommend the death penalty, as guilty findings on the death penalty specifications meant that the jury could recommend a sentence of life without parole under R.C.2929.03(D)(2)(a), a finding not otherwise provided for as a penalty for a first degree felony.
 A {¶ 5} In State v. Woodard, 68 Ohio St.3d 70, 74-75,1993-Ohio-241, the supreme court considered Brown's argument relating to the prior calculation and design specification under a plain error standard and stated:
 {¶ 6} "Assuming arguendo that there was some confusion in the jury over the need for unanimity, we are unable to conclude that the alleged error by the trial court amounts to `plain error.' The jury found appellant guilty of both counts of aggravated murder. In finding appellant guilty of the second count of aggravated murder (premeditated murder), the jury specifically and unanimously found that appellant acted with prior calculation and design. Therefore, no `patchwork verdict' as to the death specification occurred. The jury was obviously unified in its determination that appellant purposely killed Akram with prior calculation and design. Furthermore, the evidence at trial did not reasonably suggest that Akram's murder was committed by anyone other than the appellant. Therefore, the jury must have also unanimously concluded that appellant was the principal offender."
 {¶ 7} Just as in Woodard, the jury's guilty verdict as to count 1 (aggravated murder by way of prior calculation and design) could only rationally mean that it found him guilty of the corresponding prior calculation and design specification under R.C. 2903.04. We therefore overrule this aspect of Brown's argument.
 B {¶ 8} The felony murder count is more problematic in the abstract, as it is possible that the court's lack of specificity in its instruction to the jury meant that the jury could have found that Brown committed the felony murder, but did not do so as the principal offender and thus acted only with prior calculation and design. Brown defended on the theory that one of his accomplices killed the victim, so the issue is at least colorable.
 {¶ 9} Nevertheless, using the plain error standard we must employ under the circumstances, we cannot say that the result of the trial would have been different had there been a more precise instruction. It makes little sense for the jury to find Brown guilty of aggravated murder with a prior calculation and design specification, but not guilty of a corresponding count of aggravated murder with a felony murder specification. To be sure, Brown defended the charges by saying that he had not been the principal offender. But the state offered proof to the contrary, providing evidence that Brown had told one witness that he "would leave no witnesses" after the robbery. A jailhouse witness also testified that Brown told him he pulled a gun on the victim and fired as the victim pleaded for his life. The strength of this evidence is such that we cannot say that a miscarriage of justice occurred.
 II {¶ 10} During the course of trial, several of the state's witnesses gave biographical or anecdotal testimony about the victim. In addition, the victim's wife testified to the financial hardship her family faced without the victim, telling the jury that the mortgagor had foreclosed on her house. Brown argues that none of this testimony was relevant as it was offered solely to create sympathy for the victim's family and create antipathy against him.
 A {¶ 11} "Victim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused — it principally serves to inflame the passion of the jury." State v. Loyed, Cuyahoga App. No. 83075, 2004-Ohio-3961, ¶ 29, citing State v. White (1968), 15 Ohio St.2d 146. In other words, evidence of the consequences of a crime on the victim's family do nothing to prove whether the offense had been committed — it chiefly serves as a distraction for the trier of fact.
 {¶ 12} Nonetheless, the "circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime." State v. Lorraine (1993), 66 Ohio St.3d 414,420. In proper circumstances, evidence relating to the victims can give valuable background information to the jury and is thus relevant.
 B {¶ 13} Brown first complains about a young witness who frequented the victim's store, describing the victim as "cool" and saying that if he did not have enough money to buy candy, the victim would sometimes give him the candy. Brown did not object to this testimony, so we review it only for plain error.
 {¶ 14} The witness overheard Brown's plan to rob the victim and tried to warn the victim before the robbery. The witness ran to the store but discovered that he was too late — the victim had departed. The following day, the witness learned of the murder. He went to the store and told the victim's brother-in-law what he had learned from Brown. Testimony relating to the young witness' relationship with the victim was relevant because it showed why he tried to warn the victim in advance of the robbery and why he told the brother-in-law about the crime. Evidence of the witness' relationship with the victim put the witness' subsequent actions into context, and tended to bolster the credibility of those actions.
 C {¶ 15} Another witness testified that he occasionally worked for the victim and said that the victim had a reputation for being well-liked in the community. This witness went on to testify that he often ran errands for the victim, including making bank deposits. During the course of this testimony, the witness said that the victim had been well-liked by virtually all of his customers.
 {¶ 16} We find no relevant purpose for this evidence and conclude that it was offered as victim impact evidence. Even the state characterizes it as "directed at the immediate aftermath [of] the victim's killing and its impact on the operation of the store." Appellee's brief at 10. But as with all the other testimony within this assignment of error, Brown failed to object. We see no possibility that the erroneous admission of victim impact evidence relating to the operation of the store would have contributed to the jury's verdict.
 D {¶ 17} The victim's wife testified, without objection, to the names and ages of her three children, their social activities, that she had to move because of foreclosure and that the victim worked seven days a week. The wife went on to testify that on the evening of the murder she heard gunshots, went outside and found the prone victim moaning.
 {¶ 18} While information relating to the names and ages of the victim's children is innocuous at worst, we agree that the information relating to the "social activities" of the children was irrelevant for purposes of guilt. However, Brown did not object to this testimony and we cannot say that the admission of this testimony rose to the level of plain error. Nothing in the record suggests to us that the admission of this testimony dictated the outcome of trial. Moreover, the wife did give relevant testimony relating to the circumstances of the offense, so the state's brief foray into her personal history was not so egregious as to suggest that her entire purpose in testifying was to give victim impact evidence.
 III {¶ 19} In voir dire, the state exercised three peremptory challenges to excuse minority jurors. The defense raised aBatson challenge to each excusal, but the court overruled all three objections.
 {¶ 20} Under Batson v. Kentucky (1986), 476 U.S. 79, a prima facie case of purposeful discrimination in choosing jurors is established when the accused demonstrates (1) that members of a recognized racial group were peremptorily challenged and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race. If a prima facie case is established, the state must then come forward with a neutral explanation. Once a race-neutral explanation for the peremptory challenge has been offered and the court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether a prima facie showing has been made becomes moot.
 {¶ 21} When a party opposes a peremptory challenge by claiming racial discrimination, the court must decide whether granting the strike will contaminate jury selection through unconstitutional means. Hicks v. Westinghouse Materials Co.
(1997), 78 Ohio St.3d 95, 99, 1997-Ohio-227. The ultimate question is whether the trial court's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process. Because the court is in the better position to evaluate the credibility questions that naturally arise in cases of juror strikes, we cannot reverse the court's decision unless we find the court acted in a clearly erroneous manner.
 A {¶ 22} The state struck juror Crosby because the assistant prosecuting attorney believed that he had prosecuted one of Crosby's family members. Crosby denied an affiliation. The state also struck juror Bradley, who indicated that he did not want to serve on the jury because it would adversely affect his business. Both of the jurors were members of a recognized racial group, so Brown had to show that the facts and circumstances were such as to raise an inference that the jurors had been excluded on account of their race. Defense counsel told the court the state had "kicked two blacks off the jury and I see this persisting and I think it is leading into a Batson challenge, and I'm making a motion that this jury be disqualified as a result of that."
 {¶ 23} Defense counsel's objection fell short of establishing a prima facie case of discrimination because it did not create an inference of purposeful exclusion on account of race. At best, counsel could only tell the court that he believed the strikes were "leading into a Batson challenge." Of course, a prima case is always made on inference, but this is not stuff of a classicBatson challenge. See Hicks v. Westinghouse Materials Co.,78 Ohio St.3d 95, 100, 1997-Ohio-227.
 {¶ 24} Even had Brown established a prima facie case, the state amply rebutted that case by showing race-neutral reasons for the dismissals. As the court noted, the state's representation that juror Crosby had a relative who had been prosecuted by the assistant prosecuting attorney could lead to the conclusion that the juror might have harbored animosity toward the state. Regardless whether Crosby denied that to be the case, the state's desire to ensure an objective jury overrode any inference that the strike had been racially motivated.
 {¶ 25} Likewise, the court noted that juror Bradley ackowledged that he did not want to be a juror because of his pressing business matters. Brown argues that other jurors expressed similar concerns about jury service, but were not struck. Unfortunately, Brown did not mention this at the time he made his Batson challenge, so the court had no reason to consider whether other similarly situated jurors of other races were not struck. As Brown had the obligation to make a prima facie case at the time he raised the challenge, we cannot say that the court was clearly erroneous in denying the challenge based upon the arguments made at the time of the motion.
 1. B {¶ 26} The state later struck juror Carr, who was apparently the third of four black jurors to be struck. Given that 75 percent of the available black jurors had been excluded by peremptory challenges, we believe that Brown did establish a prima facie case under Batson. The court appeared to believe as much too, since it told the state "well, to the extent that you can state a reason other than race for excluding him, go ahead." In response, the state told the court that it had been concerned by the "extraordinarily long period of time" that juror Carr took when answering individual questions about his ability to recommend the death penalty, ultimately answering, "I guess." The state went on to note that when defense counsel explained the concept of lesser included offenses, juror Carr did not allow defense counsel to finish before saying, "I can do that." This led the state to believe that juror Carr would be predisposed against recommending the death penalty and would willingly seek to impose a lesser alternative. Finally, the state noted that juror Carr's body language gave it the impression that he "doesn't like this case, he doesn't want to be here." The court overruled the challenge without stating a reason.
 {¶ 27} The courts have held that body language and demeanor are permissible race-neutral justifications for the exercise of a peremptory challenge. See United States v. Changco (C.A.1, 1993), F.3d 837, 840 ("Passivity, inattentiveness, or inability to relate to other jurors [are] valid, race-neutral explanations for excluding jurors."). Admittedly, such reasons for striking a juror are subjective, and thus virtually impossible for us to review on appeal. In Hernandez v. New York (1991),500 U.S. 352, 365, the United States Supreme Court noted that because subjective assessments require a look into the prosecutor's state of mind, the trial court is better able to make judgments of credibility than an appellate court because the trial court alone has the opportunity to observe the demeanor of counsel. Hence, the clearly erroneous standard of review.
 {¶ 28} While the court did not articulate any reasons for denying the challenge, we cannot say that the decision to deny the Batson challenge as to juror Carr was clearly erroneous. We have to assume that if the court believed there were grounds to find that the state offered a pretext for dismissing juror Carr, it would have said so, particularly in light of its tacit acknowledgment that Brown had set forth a prima facie case. In other words, having accepted for purposes of the motion that Brown had made out a prima facie challenge under Batson, the court's curt denial of the challenge could only mean that it found no merit whatsoever to the challenge and fully accepted the state's race-neutral reasons for discharge.
 {¶ 29} This is not to say that any dismissal on grounds of body language is essentially unreviewable. The potential for abuse is always present and the courts have the obligation to state adequate reasons on the record for denying challenges under those circumstances. However, the attorneys must take steps to "develop the record concerning the specific behavior by venire members that motivated the peremptory challenge * * * and the district court should assess the credibility of the explanation."United States v. Jenkins (C.A.8, 1995), 53 F.3d 743, 746 (internal citation omitted).
 {¶ 30} The state told the court that it took copious notes during voir dire and cited to them when responding to theBatson challenge. While we would have preferred that the court make fuller findings of fact in response to the state's representations, the factual record presented tends to compel the court's ruling, and thus our conclusion that its decision to deny the Batson challenge was not clearly erroneous.
 IV {¶ 31} Prior to trial, Brown filed a motion in limine to exclude testimony by two separate witnesses who would testify that Brown had previously planned and aborted a robbery attempt. Douglas Lloyd was to testify that he and Brown conspired to rob the victim, but Lloyd backed out when he learned that Brown intended to murder the victim. At the same time, Lloyd and Brown had agreed to rob a person named "Darrin" after completing the robbery on the victim, but Lloyd backed out of that robbery because Brown said that he would get another gun and Lloyd did not want to be involved since he believed that Brown had killed the victim in the earlier robbery. The court overruled the motion in limine and Lloyd testified over objection to the facts stated above. Brown argues that Lloyd's testimony amounted to inadmissible other acts evidence and was used strictly to bolster Lloyd's credibility — credibility which Brown maintains had been suspect in light of conflicting statements he gave to the police.
 {¶ 32} Under Evid.R. 404(B), "evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. It may, however, be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 33} The court did not err by denying the motion in limine because Lloyd gave testimony directly related to Brown's intent in committing the murder. The testimony showed that Brown willingly carried a firearm with him during the robbery, going so far as to seek another weapon for use in a robbery he planned to commit after killing the victim. To be sure, this other acts evidence was prejudicial, but its relevance was undeniable in light of Brown's defense that he did not commit the murder.
 {¶ 34} Likewise, the testimony showed preparation, as the details given by Lloyd relating to the planned robbery of "Darrin" were very similar indeed to those used on the victim. The testimony showed that Brown planned to rob each victim with the use of a gun, and his statements about not leaving any witnesses behind could manifest an intent to kill. Consequently, we find that Lloyd's testimony was admissible for the purposes set forth in Evid.R. 404(B).
 V {¶ 35} Finally, Brown argues that all of the instances in which counsel failed to object constituted ineffective assistance of counsel.
 {¶ 36} In order to establish ineffective assistance grounds, a defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.Strickland v. Washington (1984), 466 U.S. 668, 687. Deficient performance does not prejudice a defendant unless there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 37} As we noted in our discussion of the relevant instances where we invoked the plain error analysis, none of the alleged errors would have required reversal on grounds of a manifest miscarriage of justice. While that standard is higher than the "result of trial would have been different" standard set forth in Bradley, it nonetheless informs our conclusion under the ineffective assistance of counsel standard of review. As our analysis of the claimed errors showed, we found no argument of substance to merit a reversal, and our conclusion under theBradley standard is no different. Brown makes no argument that but for counsel's trial errors, the result of the trial would have been different. Absent an argument to that effect, we have no choice but to overrule the claim of ineffective assistance of counsel.
 {¶ 38} The only real matter of contention is that counsel failed to object to the victim impact evidence offered by the state. Ordinarily, we would be disinclined to suggest that counsel's failure to object to inadmissible evidence constituted a "trial tactic." However, the circumstances of this case may have presented defense counsel with a difficult decision since repeated objections to the testimony of the victim's wife may have soured the jury. It is possible that the jurors would have viewed counsel's objections as an affront to a sympathetic witness, and counsel could rationally conclude that an objection was not worth the risk of antagonizing the jury. While we admit that all of this is in the realm of possibility, not probability, our standard of review for ineffective assistance of counsel requires us to give strategic decisions of counsel wide latitude. Viewing Brown's argument under that standard, we cannot say that counsel failed to perform effectively.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Calabrese, P.J., and Rocco, J., Concur.
(*SITTING BY ASSIGNMENT: Judge James D. Sweeney, Retired, of the Eighth District Court of Appeals.)