[Cite as *State v. Murray*, 2016-Ohio-107.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 102779

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## FULLER MURRAY

DEFENDANT-APPELLANT

---

### JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-589379-A

**BEFORE:** Boyle, J., Stewart, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** January 14, 2016

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
700 W. St. Clair Avenue
Suite 212
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Stephanie N. Hall
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

**{¶1}** Defendant-appellant, Fuller Murray, appeals his conviction, raising the following four assignments of error.

> I.   Appellant's rights to due process and equal protection under the Ohio and United States Constitutions were violated when the state excluded an African-American juror without providing a satisfactory race-neutral reason.

> II.   The trial court erred in denying Appellant's motion for acquittal when the state failed to present sufficient evidence to sustain a conviction.

> III.   Appellant's convictions are against the manifest weight of the evidence.

> IV.   Appellant was denied his right to a fair trial when the prosecutor improperly disclosed a prior conviction.

**{¶2}** After a thorough review of the record and arguments raised, we affirm.

**A.   Procedural History and Facts**

**{¶3}** Fuller was indicted on five counts: improperly discharging into a habitation, in violation of R.C. 2923.161(A)(1); two counts of felonious assault, in violation of R.C. 2903.11(A)(2); unlawful possession of dangerous ordnance, in violation of R.C. 2923.17(A); and having weapons while under disability, in violation of R.C. 2923.13(A)(2).   The first three counts carried one- and three-year firearm specifications and all the counts carried a forfeiture specification.   He pleaded not guilty to the charges, and the matter proceeded to a jury trial where the following evidence was presented.

**{¶4}** On the evening of September 14, 2014, Murray and his next-door neighbor, Yul Martin, got into an argument over Murray's cell phone.   Yul Martin testified that he

asked Murray, who was sitting in his car parked outside of his house, to borrow his cell phone to make a phone call because Yul's phone had been turned off for nonpayment of his bill. Yul explained that he and Murray are usually "cool" so he did not expect a problem, but Murray had been drinking and "kept like saying stuff to me like he was looking at me." Yul walked away and then Murray hopped out of his car and insisted on Yul using his phone. Yul told him no and then left to go pay his phone bill.

{¶5} While Yul was gone, his wife, Bianca, returned home from work and encountered Murray on her front porch. Bianca testified that Murray was looking for her husband and had indicated that he and Yul "had words" about Murray's phone. According to Bianca, Murray was intoxicated and acting "very aggressive."

{¶6} Ten minutes later, Yul returned home, spoke to his wife, and then called outside for Murray. Yul testified that Murray "was cussing like going off" and that Murray was grabbing his clothes. Yul kept "breaking him away," telling Murray to get his hands off of him. According to Yul, the altercation lasted three to five minutes before he left to go inside. Throughout the encounter, Bianca was calling for Yul to return inside.

{¶7} Approximately 15 to 20 minutes later, while Yul and Bianca were inside their bedroom, they heard a loud noise and glass shattering in their dining room. Bianca immediately called 911.

{¶8} Murray also called 911 following the shooting. According to Khadija Kelly, the 911 dispatcher who took Murray's 911 call, Murray had slurred speech and

stated that "he just needs somebody to come get him." Kelly attempted to identify Murray's location. Murray repeatedly stated that he was "running through the alley." Kelly testified that Murray never stated that he shot into a home, nor did he state that he accidentally discharged a shotgun.

{¶9} The state presented the testimony of the Cleveland officers that responded to the scene and the officer who picked up Murray a couple of blocks from his residence. Cleveland police officer Westley Woods testified that he found Murray walking southbound on East 100th Street, toward Wade Avenue — approximately two blocks from Murray's residence. Officer Woods arrested Murray, placed him in the back of his patrol car, and returned to Dunlap Avenue where several other officers were already on the scene. Officer Woods testified that Murray was intoxicated, "saying I didn't do nothing." Officer Woods ultimately transferred Murray to the zone car of Officer Karl Lloyd — the lead officer on the scene.

{¶10} Cleveland police officer Timothy Hannon testified that he and his partner, Officer Lloyd, arrived on the scene and immediately spoke with the victims. Inside the victims' home, Officer Hannon observed the dining room window that had been "broken out." According to Officer Hannon, "there was glass all over the floor and when we looked at the wall parallel to it, it was full of pellet holes or a hundred pellet holes just peppered through the wall which would be cognizant like a shotgun blast bird shot." He further explained that he noticed that the kitchen window of the house next door was also "broken out," prompting the officers to go next door.

{¶11} The officers knocked on Murray's residence and obtained consent from Murray's wife to search the house. Officer Hannon testified that they were searching for a shotgun based on the bird shot rounds identified in the victims' house. Under a missing floorboard in the attic, the police discovered four bird shot shell casings. The police also ultimately discovered a sawed off shotgun hidden between two bags in Murray's basement. The shotgun had a spent shotgun shell still inside.

{¶12} Officer Lloyd testified that Murray's demeanor was "very bad" while he awaited in the patrol car. Officer Lloyd was forced to put up the window in the back seat after Murray yelled profanities out the window to Yul (who was standing outside his house) and threatened that "he was going to fuck him up when he got out." Officer Lloyd further testified that Murray was highly intoxicated.

{¶13} Officer Lloyd also testified as to his observations of Murray's kitchen window that had been fired upon. According to Officer Lloyd, the "window was shot out from close range" based upon the fact that the glass from Murray's window did not spread.

{¶14} The state also produced evidence of Murray's prior 2008 conviction for aggravated assault.

{¶15} Murray testified on his own behalf. Murray admitted to possessing the sawed off shotgun and admitted to having a prior conviction for aggravated assault. He also acknowledged that he was intoxicated on Sunday, September 14. According to Murray, he felt threatened after his encounter with his neighbor and believed that the

"Heartless Felons" were coming for him. Based on this belief, Murray retrieved his shotgun from the attic and placed it on his refrigerator — he did not want his wife to see the gun but wanted to be "ready." Murray further testified that he pulled the trigger "to see if the safety engaged" but did not believe that there was any way that the gun would discharge. Murray stated that, after the firearm was discharged, he was "in shock" but that he still called 911 to "come clean." Murray further testified that he did not tell the officers that it was an accident because "they was beyond the point of caring."

{¶16} On cross-examination, Murray stated that he had owned the shotgun for four years and assumed that he loaded the shotgun, but did not remember doing so. According to Murray, he had been drinking ever since he got out of church that day but denied being "that drunk." Murray stated that he placed the gun in the basement to keep it away from the kids. Upon the prosecutor questioning Murray on his 911 call, Murray stated that he was referring to himself when telling the operator that he was "going to fuck somebody up."

{¶17} The jury ultimately found Murray guilty on all counts, and the trial court imposed a total sentence of six years in prison. This appeal follows.

## B. *Batson* Challenge

{¶18} In his first assignment of error, Murray, who is African American, argues that his constitutional rights were violated when the trial court allowed the state to peremptorily excuse prospective Juror R., an African-American male, over his *Batson* objection. We disagree.

{¶19} In *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution.

{¶20} Trial courts are to apply a three-step procedure for adjudicating a *Batson* claim. First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. *Id.* at 96. To establish a prima facie case of purposeful discrimination in choosing jurors, the accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged, and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race. *Id.* Second, if the trial court finds that the opponent has set forth a prima facie case, then the proponent of the strike must come forward with a racially neutral explanation for the strike. *Id.* at 95. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97. Finally, if the proponent puts forth a racially neutral explanation, the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.*

{¶21} At the final stage of the *Batson* inquiry, the court "must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. The judge must "assess the plausibility" of the prosecutor's reason for striking the juror "in

light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

{¶22} "A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 64, citing *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 64. This deferential standard arises from the fact that step three of the *Batson* inquiry turns largely on the evaluation of credibility by the trial court. *See State v. Herring*, 94 Ohio St.3d 246, 257, 2002-Ohio-796, 762 N.E.2d 940, citing *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶23} Following the state's use of its third peremptory strike on prospective Juror R., the defense raised a *Batson* challenge. At that point, the state had already moved to excuse two other African-American individuals — (1) an African-American male, who is a criminal-defense attorney known to the prosecutor, defense counsel, and trial judge, and (2) an African-American female, whose son had been convicted approximately one month earlier for a gun violation.

{¶24} In response to the trial court's inquiry, the prosecutor provided the following reasons for excusing Juror R.:

> He's falling asleep. He appears, during the voir dire, he appears to be disinterested. Outside of the fact when we cleared up why he was upset

with your example of the bias and prejudice. As I sit next to him throughout your questioning, he had very strong body language and positioning of himself in the seat during the time you were asking about the bias and prejudice. I just thought, one, he was offended like he said he was, and then as we went on throughout the voir dire process, he seems disinterested, falling asleep, as if he has something else he would rather be doing.

**{¶25}** The defense counsel responded to the prosecutor's remarks as follows:

Obviously [the prosecutor] is seated closer to him, but I didn't see him falling asleep, I didn't notice that disinterested aspect, maybe the Court did, but I did not notice that, I would say that.

**{¶26}** The trial judge stated that he had not noticed the same things described by the prosecutor, but acknowledged that he had not been watching Juror R. The trial judge ultimately rejected the defense counsel's *Batson* challenge after discussing the basis of each previously exercised peremptory strike and implicitly finding no pretext for racial discrimination. The record reflects that, after the trial judge excused Juror R., one African-American woman remained among the 12 in the jury box and a single African-American male remained among the three potential jurors left in the jury pool.

**{¶27}** Murray argues that the state failed to provide a race-neutral explanation to exclude Juror R. The prosecutor relied on Juror R.'s demeanor and body language as grounds to exclude him, stating that he initially seemed offended when the trial judge discussed bias and prejudice and then ultimately disinterested to the point of "falling asleep." Contrary to Murray's assertion, "[b]ody language and demeanor are permissible race-neutral justifications for exercising a peremptory challenge." *State v.*

*Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, ¶ 40, citing *State v. Brown*, 8th Dist. Cuyahoga No. 84059, 2004-Ohio-6862.

**{¶28}** The record reflects that, upon questioning from the prosecutor, Juror R. admitted to the prosecutor during voir dire that he initially took offense to the judge's statements regarding bias and stereotypes. Specifically, upon the prosecutor commenting to Juror R. on his demeanor during the trial judge's discussion of bias and stereotypes, Juror R. stated that he "kind of took offense to it." It is clear from the record that Juror R.'s body language initially raised a red flag with the prosecutor, causing the prosecutor to pay particular attention to Juror R. Notably, the prosecutor's assessment of Juror R.'s strong body language and the inference of him taking offense was confirmed by Juror R.'s acknowledgment. We further note that, while the trial judge may not have seen Juror R. falling asleep, the trial judge did specifically comment on Juror R. appearing "tired" earlier in the voir dire process.

**{¶29}** While it is true that a trial judge's first-hand observations are of great importance when the explanation for a peremptory challenge invokes a juror's demeanor, a trial judge may still accept the prosecutor's explanation even if the trial judge does not personally recall the juror's demeanor. *State v. Moseley*, 8th Dist. Cuyahoga No. 92110, 2010-Ohio-3498, ¶ 39. Indeed, "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor." *Thaler v. Haynes,* 559 U.S. 43, 49, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010), citing *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), and *Hernandez v. N.Y.*, 500 U.S. 352, 365, 111

S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). And here the trial court determined that the prosecutor's stated reason was not pretextual for discrimination.

**{¶30}** We likewise find this court's decision in *State v. Strong,* 8th Dist. Cuyahoga No. 100699, 2015-Ohio-169, to be distinguishable and does not support reversing the trial court's decision in this case. In *Strong*, the prosecutor's proffered reason for exercising a peremptory strike against a juror was that he had concerns of the juror being able to pay attention because "[h]e has an extremely wide-eyed look, like he has a thousand-yard stare." We held that the trial court failed to appropriately evaluate the context of the prosecutor's proffered reasoning for excusing a juror under the third step of *Batson*, especially since the juror's responses during the voir dire process directly refuted any claim of an inability to pay attention. *Id.* at ¶ 29. We also found the prosecutor's proffered explanation both offensive and disconcerting, emphasizing that "it was not the juror's body language that was being questioned but his physical appearance." *Id.* at ¶ 23.

**{¶31}** Unlike *Strong*, there is no evidence in the record refuting the prosecutor's explanation to excuse Juror R., and the prosecutor's stated reasoning had nothing to do with Juror R.'s physical appearance.

**{¶32}** Based on the record before us, we cannot say that the trial court's denial of Murray's *Batson* challenge was clearly erroneous.

**{¶33}** The first assignment of error is overruled.

**C.  Sufficiency of the Evidence**

**{¶34}** In his second assignment of error, Murray argues that the state failed to present sufficient evidence that he acted "knowingly" to support the convictions for felonious assault and improperly discharging a firearm into a habitation. We disagree.

**{¶35}** When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶36}** R.C. 2923.161(A)(1) defines the offense of improperly discharging into a habitation and provides that "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."

**{¶37}** Under R.C. 2903.11(A)(2), felonious assault, "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶38}** "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶39}** The state presented evidence that Murray fired his sawed-off shot gun following his altercation with Yul. The shotgun was discharged from Murray's kitchen window at close range, firing a bird shot casing directly through the Martins' dining room window. The record further revealed that Murray was intoxicated at that time, fled his house immediately following the shooting, and then called 911 and asked for the police to come get him. Murray never stated that he accidentally shot the sawed-off shot gun. The record further revealed that Murray was extremely angry and acted erratic even after the police arrested him and placed him in the patrol car. Construing this evidence in a light most favorable to the state, we find that any reasonable juror could find beyond a reasonable doubt that Murray "knowingly" fired the shotgun.

**{¶40}** The second assignment of error is overruled.

### D. Manifest Weight of the Evidence

**{¶41}** In his third assignment of error, Murray argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶42}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. When reviewing a claim challenging the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). After reviewing the entire record, the reviewing court must

weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

**{¶43}** Murray essentially argues that the jury lost its way in convicting him because he did not knowingly fire his shotgun. Murray relies on his testimony in support of this claim. Although Murray testified that he accidentally discharged his shotgun, the jury obviously found his testimony not credible. And based on the evidence presented by the state, we find that the jury reasonably discarded Murray's testimony. Murray's actions severely undermined any claim that he accidentally discharged the shotgun. Notably, Murray retrieved the shotgun immediately following his altercation with Yul and specifically stated to the 911 dispatcher following the shooting that he was "going to fuck somebody up." Further, Murray never once stated to the 911 dispatcher or the officers arriving on the scene that he "accidentally" discharged the shotgun. And while Murray damaged his own kitchen window by shooting through it and into the Martins' dining room window, we do not find that conclusive of an accidental shooting. Indeed, Murray was highly intoxicated and angry at the time of the shooting. Further, the testimony revealed that the firearm was fired at close range from his kitchen window and that the bird shot casing traveled directly into the Martins' dining room. We find that the state's evidence overwhelmingly belies any claim of an accidental shooting.

**{¶44}** The third assignment of error is overruled.

## E. Prosecutorial Misconduct

{¶45} In his final assignment of error, Murray argues that he was denied a fair trial when the prosecutor improperly questioned him on a prior conviction of domestic violence. He argues that the prosecutor's question amounts to prosecutorial misconduct that deprived him of a fair trial. We disagree.

{¶46} In addressing a claim of prosecutorial misconduct, we must determine whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected Murray's substantial rights. *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). When applying this test, we consider the effect the misconduct had on the jury in the context of the entire trial. *State v. Tilley*, 8th Dist. Cuyahoga No. 96756, 2012-Ohio-1533, ¶ 19. We will not deem a trial unfair if, in the context of the entire trial, it appears beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *Smith* at 15. (Citation omitted.)

{¶47} Murray complains of the following line of questioning by the prosecutor during her cross-examination of him:

> [Prosecutor] Q.: Now, you've not only been convicted of aggravated assault, you've been convicted of a couple of violent crimes, it that correct?
>
> [Murray]: A.: Yes.
>
> [Prosecutor]: Q.: Domestic violence?
>
> [Defense Counsel]: Objection, your Honor. May I approach?
>
> [Murray]: I was never charged with that.

{¶48} The parties then engaged in a sidebar discussion wherein the defense counsel objected to the prosecutor asking Murray about his domestic violence conviction

— a conviction that occurred more than ten years ago. The prosecutor urged the trial court to allow the evidence of the prior conviction on the grounds that it involved a violent offense like the instant case. The trial court refused and provided the following curative instruction:

> Ladies and gentlemen, you are instructed to disregard the last question and answer with respect to whether the defendant was ever convicted of an offense of domestic violence. You are to ignore the question and any response given to that question.
> Furthermore, I instruct you once again that the fact of a person's prior conviction, whether a witness or a defendant, may only be used by the jury in assessing that individual's credibility. You may consider it as one of the factors in determining whether or not you believe the testimony given by the individual on the witness stand but you may not consider it in determining whether that individual is guilty of any offense as charged in the indictment. Do you all understand that?

> The Jury: Yes.

{¶49} The state concedes that the trial court properly excluded any testimony regarding Murray's domestic violence conviction but argues that the prosecutor's question did not prejudicially affect Murray's substantial rights. We agree. While Murray initially answered the prosecutor's question affirmatively, he expressly denied having been convicted of domestic violence. But more importantly, the trial court immediately gave a curative instruction. *See State v. Charley*, 8th Dist. Cuyahoga No. 82944, 2004-Ohio-3463, ¶ 51, citing *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994) (jury is presumed to follow the instructions, including curative instructions, given by a trial judge). Further, the jury was already aware of Murray's previous aggravated assault conviction based on Murray's own testimony; thus, the impact on the

jury of an improper reference to a prior conviction is considerably diminished by the jury's knowledge of Murray's previous aggravated assault conviction. Based on the totality of the record, we cannot say that Murray was denied a fair trial — it appears clear beyond a reasonable doubt the jury would have found Murray guilty even without the improper comment.

**{¶50}** The fourth assignment of error is overruled.

**{¶51}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

MELODY J. STEWART, P.J., and
SEAN C. GALLAGHER, J., CONCUR